IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

| | |
|---|---|
| Soo Line Railroad Company<br>a Minnesota corporation,<br><br>Plaintiff,<br><br>v.<br><br>Ashland, Inc.,<br>a Kentucky corporation,<br>and Murphy Oil USA, Inc.,<br>f/k/a Murphy Corporation,<br>a Delaware corporation,<br><br>Defendants. | Case No. CV 01-1628 ADM/AJB<br><br>**MEMORANDUM IN SUPPORT OF ASHLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## Introduction

Ashland Inc. ("Ashland") brings this motion for partial summary judgment to dismiss several counts of the complaint. Plaintiff is responsible under several environmental statutes for the costs of a remedial investigation of its own rail yard, which abuts Central Avenue in northeast Minneapolis, because plaintiff owns the property at which the hazardous wastes and substances are located or from which releases have occurred or are occurring, and because plaintiff owned and operated the facility at the time of disposal of hazardous wastes and substances. Plaintiff seeks contribution for some of the costs that plaintiff has incurred or may incur from two former tenants who occupied small parcels for periods of time along Central Avenue, Ashland and Murphy Oil USA, Inc. ("Murphy"). However, the applicable statutes upon which plaintiff relies do not provide a basis for plaintiff to obtain cost recovery from Ashland in this action, either as to past or future costs. And, plaintiff's common law claims are barred by an applicable statute of limitations.

The following claims against Ashland should be dismissed for the following reasons:

- Counts Two and Three, both of which are based upon Section 113 of the Comprehensive Environmental Response, Contribution and Liability Act ("CERCLA"), 42 U.S.C. § 9613, must be dismissed in view of the December 13, 2004, ruling of the United States Supreme Court in *Cooper Industries, Inc. v. Aviall Services, Inc.,* 125 S.Ct. 577 (2004).
- Count One, which is based upon CERCLA Section 107, 42 U.S.C. § 9607, must be dismissed because plaintiff is not an "innocent party" within the meaning of the term under any judicially-created exception pertaining to Section 107, and this Court has already ruled that CERCLA Section 107 claims would be available only if some exception applies under Section 107 in favor of plaintiff.
- Counts Five and Six, which are based upon Section 115B.04 of the Minnesota Environmental Response and Liability Act ("MERLA"), must be dismissed because plaintiff's claims pertain to remedial costs and MERLA does not impose liability upon Ashland for the remedial costs incurred by a private party such as plaintiff.
- Counts Seven through Fourteen, plaintiff's state common law and contract claims, must be dismissed because an applicable statute of limitations had expired before plaintiff commenced its action (and before any tolling had taken effect).

Thus, the pending motion will resolve all cost recovery issues for this case and will help to focus and limit the scope of any remaining issues.[1]

---

[1] The current motion does not address Count Four, which is based upon the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6971, *et seq.* RCRA allows injunctive relief for imminent and substantial endangerment to health or the environment but does not provide for private cost recovery. *Meghrig v. KFC Western, Inc.* 516 U.S. 479, 488 (1996); *Albany Bank & Trust Company v. Exxon Mobil Corporation,* 310 F.3d 969 (7th Cir. 2002);

# ARGUMENT

## I. STANDARD OF REVIEW

Ashland's motion arises under Fed. R. Civ. P. 12(b)(6) and under Fed. R. Civ. P. 56. Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if . . . there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. As the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action." ' *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1).

When determining whether a genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law, the court's function is not to make credibility determinations and weigh evidence, or to attempt to determine the truth of the matter; rather, the court must "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 255 (1986); *see also Johnson v. Crooks,* 326 F.3d 995, 1007-08 (8th Cir. 2003). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *See Anderson,* 477 U.S. at 250. Only disputes over facts that might affect the outcome of the suit under the governing substantive law, however, will properly preclude the entry of summary judgment. *Id.* at 248.

## II. CERCLA § 113 MUST BE DISMISSED UNDER *COOPER V. AVIALL*

On December 13, 2004, the United States Supreme Court issued a ruling that dramatically redefines the availability, timing and role of private cost recovery actions for

---

*Furrer v. Brown,* 62 F.3d 1092 (8th Cir. 1995). Plaintiff has not asked for cost recovery under RCRA in the complaint.

environmental litigation. Specifically, the Court ruled that a plaintiff may not pursue a Section 113 contribution claim under CERCLA for voluntary remedial actions. A plaintiff may bring a Section 113 contribution claim only if a state or the federal government has first filed a civil action against the plaintiff under Sections 106 or 107 or if it has resolved its liability to a state or the federal government with an administrative or judicially approved settlement. *Cooper Industries Inc. v. Aviall Services Inc., supra*. In that case, Aviall had purchased properties from Cooper and later discovered that both it and Cooper had contaminated them when hazardous substances leaked into the ground and groundwater. After Aviall notified the state, the state directed Aviall to remediate the site and threatened an enforcement action. But neither the state nor the federal government initiated judicial or administrative actions to compel cleanup. Aviall voluntarily cleaned up the properties under the state's supervision and commenced an action under CERCLA seeking contribution from Cooper. The Supreme Court decided that the plain language of CERCLA Section 113 did not authorize the contribution action.

In the aftermath of *Cooper v. Aviall*, at least three district courts have already dismissed Section 113 claims. *Elementis Chemicals Inc. v. TH Agriculture and Nutrition, L.L.C.,* 2005 U.S. Dist. LEXIS 1404 (S.D.N.Y. Jan. 31, 2005)(the parties acknowledged, in the wake of *Aviall v. Cooper,* that the Section 113 claim could not be pursued); *AMW Materials Testing, Inv. v. Town of Babylon,* (E.D.N.Y., No. 01 CV 4245, 2004)(since plaintiffs had "voluntarily initiated cleanup of the site and cannot satisfy the requirement of an existing specified civil action," their § 113 action for contribution "is not permitted"); *Pharmacia Corporation, et al., v. Clayton Chemical Acquisition LLC., et al,* No. 02-cv-0428-MJR (S.D. Ill. March 8, 2005)(administrative orders issued by US EPA did not constitute civil actions or approved settlements; thus Section 113 claim could not be pursued).

Here, plaintiff has not alleged that the government has initiated an action against it under Sections 106 or 107 or that it has resolved its liability with the state or the federal government. Rather, just like Aviall, plaintiff has been conducting a voluntary remedial action. Accordingly, Count Two, plaintiff's Section 113 contribution claim, is invalid for exactly the same reasons set forth in C*ooper v. Aviall* and must be dismissed.

Count Three seeks a declaratory judgment addressing "natural resource damages," ostensibly based upon CERCLA § 113(g)(2) and 28 U.S.C. § 2201 and 2202.[2] The Supreme Court has clearly ruled that *any* actions for contribution under CERCLA Section 113 are conditioned upon the requirements of Section 113 (actions under Sections 106 or 107 or settlements with a state or the federal government). Since neither the federal government nor the State of Minnesota has commenced such a civil action and neither has settled with plaintiff, plaintiff's petition for a declaratory judgment based upon Section 113, seeking to address plaintiff's speculation about potential natural resource damages claims, fails as a matter of law.

---

[2] Plaintiff's reference to § 113(g)(2) in relation to natural resource damages is puzzling. Section 113(f) provides for contribution. Section 113(g)(1) addresses the period in which actions for natural resources may be brought and does not say anything about declaratory judgments to be initiated by private parties. Section 113(g)(2) addresses the periods in which actions for "the costs referred to in section 107" may be brought. Section 113(g)(2) does refer to a declaratory judgment for "further response costs or damages." It appears that plaintiff hopes for a declaratory judgment about natural resource damages under Section 113(g)(2). However, the better reading of Section 113(g)(2) is that the subsection pertains to response costs, not to damages for natural resources. Any liability for damages to natural resources under CERCLA § 107(a)(C) runs to the United States government or the State of Minnesota, not to private persons. CERCLA § 107(f)(1). (In a parallel provision, MERLA § 115B.17, subd. 7 declares that the state is the trustee of natural resources and any action for damages to those resources is to be brought by the attorney general.) There have been no natural resources damages claims by any government agency. Paragraph 20 of the complaint states only that offsite contamination "may lead to a conclusion by one or more governmental entities that natural resources have been damaged and require mitigation, remediation and/or replacement." Thus, the plaintiff has no valid claim under § 113(g)(2) for natural resource damages, not only for the reasons discussed in the main body of this memorandum, but also because the section is inapplicable to such claims and because it is speculative whether any such claims will ever be brought, what they would be based upon, and what they would entail.

## III. CERCLA § 107 MUST BE DISMISSED BECAUSE PLAINTIFF IS NOT AN "INNOCENT PARTY"

In its Memorandum Opinion and Order dated March 14, 2004, this Court ruled that plaintiff may pursue a Section 107 claim only if some exception applies. This Court observed that discovery may reveal that plaintiff is unqualified for innocent landowner status because it may have contributed to the pollution in some way.[3] In so doing, this Court followed Eighth Circuit precedent set forth in *Dico, Inc. v. Amoco Oil Co.*, 340 F.3d 525, 529 (8th Cir. 2003).

Two of the cases cited above that have dismissed Section 113 claims following *Cooper v. Aviall, supra,* also dismissed Section 107 claims as well. *See Elementis Chemicals Inc. v. TH Agriculture and Nutrition, L.L.C.,* 2005 U.S. Dist. LEXIS 1404 (S.D.N.Y. Jan. 31, 2005); *AMW Materials Testing, Inv. v. Town of Babylon,* (E.D.N.Y., No. 01 CV 4245, 2004). The *Elementis* decision provides an extended discussion demonstrating that the Supreme Court's decision in *Aviall v. Cooper* should not be construed to call into question the Second Circuit decision in *Bedford Affiliates v. Sills,* 156 F.3d 416 (2d Cir. 1998), which held that Section 107 claims are not available for a potentially responsible party (thus, reaching a conclusion similar to that of the Eighth Circuit in *Dico*). The *Elementis* court dismissed the Section 107 action because the plaintiff was a responsible party. The same reasoning commends continued reliance upon *Dico* in the Eighth Circuit.

Ashland moves for summary judgment on the CERCLA § 107 claim because the record establishes two compelling reasons why plaintiff cannot qualify as an innocent landowner:

---

[3] The Court also hesitated to either embrace or disavow the innocent landowner exception because the *Dico* court had specifically reserved judgment on the question whether that implied exception will be recognized in the Eighth Circuit. *See Dico, Inc. v. Amoco Oil Co.*, 340 F.3d 525, 529 (8th Cir. 2003). In the *Dico* case, the Eighth Circuit decided that it did not need to reach the question whether it would recognize a judicially-created exception for § 107 liability because the evidence demonstrated that the claimant was itself a responsible party.

First, plaintiff is responsible for its own releases of chlorinated solvents and other hazardous substances that are contributing to soil and groundwater contamination at Shoreham Yard. In the complaint, the term "Site Contaminants" includes chlorinated solvents, diesel range organic compounds ("DROs") and gasoline range organic compounds ("GROs"), among other things. Plaintiff's Remedial Investigation Report for the East Side Shoreham Facility, prepared by Golder Associates, Inc., dated February 2005, makes clear that plaintiff's operations have caused releases of hazardous substances, including chlorinated solvents.[4] Also, plaintiff's records reveal beyond dispute that plaintiff released large volumes of DROs and GROs[5] and that these compounds migrated from the area where plaintiff released them to and under the former lease areas.[6] Thus, plaintiff is responsible for the release of hazardous substances at Shoreham Yard and at the site under investigation and remediation.[7]

---

[4] Affidavit of Laura M. O'Donnell in Support of Ashland's Motion for Partial Summary Judgment ("O'Donnell Affidavit"), ¶¶ 85 to 88 and Exhibit 87.

[5] O'Donnell Affidavit, ¶¶ 63 and 89.

[6] See the third paragraph of note 7, *infra*.

[7] The Remedial Investigation Report for the East Side Shoreham Facility, prepared by Golder Associates, Inc., dated February 2005, makes clear that plaintiff's operations have caused releases of hazardous substances, including chlorinated solvents. For example, with respect to the Round House Area, an area exclusively owned and operated by plaintiff, the report notes that "the principal contributors to this area's contamination appear to be locations where locomotives were cleaned and maintained, drum storage areas, and a dumpster location." O'Donnell Affidavit, Exhibit 87, p. 7. The report describes chlorinated solvent soil contamination in the southeastern portion of the Round House Area at, among other places, page ES-7 and groundwater impacts beneath the Round House associated with chlorinated VOCs at, e.g., pages ES-7 – ES-8. With respect to the former Waste Reclamation Area, the report states that "[c]hlorinated VOCs have been reported above risk based criteria in locations where drums were stored directly on surface soils. * * * Contamination in groundwater is reported * * * for several compounds associated with chlorinated and non-chlorinated commercial solvents. *Id.*, p. 8. Plaintiff offers the conclusion in the 2005 Remedial Investigation Report, at page 39, that: "In shallow groundwater, there also appears to be a horizontal path from the Former Ashland Lease Area to the south that merges with shallow impacts present in the Waste Reclamation Area." Also, "the two impacted areas, from beneath the Former Ashland Lease Area and from beneath the Round House Area, merge within the OPD and migrate laterally to the south . . ."

Second, plaintiff is not an innocent landowner because it was an owner with a direct contractual relationship with its tenant, Rocket Products, during the time that Rocket Products handled and released hazardous substances during its tenure as plaintiff's lessee.[8] There is no question that plaintiff is responsible for the releases that occurred at the lease area during the Rocket Products tenure. Under Section 107(a)(2), "*any person who* at the time of disposal of any hazardous substance *owned* or operated any facility at which such hazardous substances were disposed of" is liable.

---

In addition, plaintiff is responsible for a plume of groundwater contamination that begins in the 'collector pan area' and extends its influence into the former lease areas. *See* O'Donnell Affidavit, Exhibit 60, p.1 (MPCA001652). In February 1996, plaintiff explained that the petroleum releases and other potential sources of contamination "are commingled, especially in the lease area." From 1995 until 1999, plaintiff operated recovery wells to intercept flows from the collector pan area. However, plaintiff discontinued operation of those wells in 1999 to allow additional study of the lease area groundwater plumes, among other things. *See* O'Donnell Affidavit, Exhibit 57, note 13 (SLR004888). In 2001, plaintiff referred to the "free product" at both the collector pan area and the former lease area as "this area," again confirming the interaction of sources from the collector pan area and the former lease area. *Id*., Exhibit 73, § 4.2.5.4. In the RI Report, plaintiff has reported 'LNAPL' is found in both the collector pan area and in the former lease area, although plaintiff reports that "diesel fuel-type constituents" predominate in the collector pan area and solvents predominate in the lease area. *Id.*, Exhibit 87, p. ES-6.

Ashland believes that there are reasons to distinguish the lease area plume from some of the plumes emanating from other areas of Shoreham Yard controlled by plaintiff. For example, Ashland contends that divisibility can be employed to separate the lease area plume from the Round House plume. *See, e.g., United States v. Hercules, Inc.*, 247 F.3d 706 (8th Cir. 2001). However, some of the plaintiff's plumes (those in the collector pan area, for example) are upstream from and plainly affect the former lease area. And, even if one assumes that the former lease area is entirely divisible from any plumes emanating from plaintiff's own operations, plaintiff is still not an innocent party under Section 107, because plaintiff is responsible for the releases of its tenant, Rocket Products, as discussed *infra*. Additional information concerning plaintiff's investigation and confirmation that plaintiff released hazardous substances is set forth in ¶¶ 20-23, 26, 28-29, 31-32, 39-72, 74, and 76-90 of the O'Donnell Affidavit.

[8] The details of this evidence are set forth in O'Donnell Affidavit ¶¶ 6, 7, 8, 9, 10, 72 and 73. Plaintiff concedes that it leased the relevant parcel of property to Rocket Products for a "chemical blending plant and office." The evidence demonstrates that Rocket Products released chemicals during its tenancy. Plaintiff was the owner during the entire time of Rocket Products' and Ashland's tenancies. CERCLA § 107(a) imposes liability upon owners of a facility as well as those who owned or operated a facility at the time of disposal of any hazardous substance.

In a patently obvious effort to obscure plaintiff's own responsibility for the actions of Rocket Products, the complaint asserts, without any basis for the bald legal conclusion, that Ashland is the successor to Rocket Products. This contention is groundless. Ashland acquired some assets from a bankruptcy trustee after Rocket Products went bankrupt. Ashland is not the successor to Rocket Products under either Minnesota law or the majority federal rule, employed in the Eighth Circuit, which holds that mere asset purchasers are not liable as successors unless one of four exceptions is met. *Compare Niccum v. Hydra Tool Corp.,* 438 N.W.2d 96, 98 (Minn. 1989), *with United States v. Mexico Feed & Seed Company, Inc.,* 980 F.2d 478 (8th Cir. 1992).[9] Plaintiff has not alleged that any of the four exceptions set forth in either *Niccum* or *Mexico Feed* apply, and there is no basis for such an allegation.[10] Thus, plaintiff cannot rely upon the successor liability doctrine to shift to Ashland its own responsibility for the releases attributable to Rocket Products.

In light of these facts, plaintiff is not an innocent landowner.[11] To the contrary, plaintiff is strictly liable as a responsible party for contamination at its property. Therefore, it could not

---

[9] In *Niccum,* the court outlined the well-established rule under Minnesota law that where one corporation acquires assets from another corporation, the acquiring corporation is not liable for the debts and liability of the transferor unless one of four situations exist: (1) the purchaser expressly or implicitly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the corporation; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape liability. In *Mexico Feeds,* the court used the same four tests, except to broaden the third test to "substantial continuity." Subsequent Supreme Court decisions, such as *O'Melveny & Meyers v. FDIC,* 512 U.S. 79 (1994) and *United States v. Bestfoods,* 118 S. Ct. 1876, 1886, n.9 (1998) undermine the validity of the *Mexico Feed* line of cases that rely upon CERCLA's intent to rewrite the basic doctrines of corporate law. In this case, however, regardless of the test used, Ashland is not a successor to Rocket Products.

[10] O'Donnell Affidavit, ¶¶ 11, 12, 14, 16 to 19.

[11] There are additional reasons why plaintiff cannot qualify as an innocent landowner, including its placement of contaminated materials on the former lease areas and actions that caused the movement of contamination to, at and from the lease areas. However, Ashland is not relying upon these additional reasons for the present motion.

qualify for the innocent landowner exception even if the doctrine were embraced in the Eighth Circuit. Accordingly, the CERCLA Section 107 claim must be dismissed.

## IV. PLAINTIFF'S CLAIMS UNDER MERLA § 115B.04 MUST BE DISMISSED BECAUSE THERE IS NO LIABILITY FOR PLAINTIFF'S REMEDIAL COSTS

Plaintiff's MERLA claims must be dismissed because Ashland is not liable for remedial costs incurred by plaintiff under MERLA.[12] MERLA establishes liability for *response costs,* meaning either removal or remediation costs, *only if* they are incurred by the EPA, the state or a political subdivision. Minn. Stat. § 115B.04, subd. 1(a). Liability under MERLA Section 115B.04 subdivision 1(b) attaches only to reasonable and necessary *removal* costs incurred by "any person" (other than the State, a political subdivision or the United States). Under Minnesota Statutes Section 115B.04, subdivision 1(b), any person who is responsible for a release of a hazardous substance[13] "is strictly liable, jointly and severally for the following response costs and damages which result from the release . . .; (b) All reasonable and necessary *removal* costs incurred by any person." (Emphasis added). Thus, the Minnesota Legislature distinguished removal actions from remedial actions for purposes of cost recovery. For costs incurred by "any person" (other than the EPA, the state or a political subdivision), MERLA liability extends only to *removal* costs and not to *remedial* costs.[14] As will be seen, removal costs implicate short-

---

[12] The Court has already dismissed Count Five insofar as it is based upon Minnesota Statutes Sectoin 115B.05.

[13] Ashland assumes, strictly for purposes of this motion, that it did release hazardous substances during its operations at the former lease area. Ashland does not concede the fact, timing, nature or amount of any such releases. However, for purposes of this motion, it is unnecessary to address such matters. Ashland also reserves all other defenses with respect to the application of MERLA.

[14] Under Minnesota law, a court must give a plain reading to any statute it construes, and when the language is clear, the court must not engage in any further construction. In *Hyatt v. Anoka Police Department,* 691 N.W.2d 824 (Minn. 2005), the Minnesota Supreme Court stated:

term, limited, emergency actions whereas remedial costs connote longer term, methodical investigations and actions associated with a permanent remedy. The Minnesota Legislature has excluded remedial costs from private cost recovery (but, as will be discussed below) allows a private party to seek reimbursement of those remedial costs from an administrative fund administered by the MPCA in its enforcement discretion.

The same conclusion follows under Minnesota Statutes § 115B.08, which provides for apportionment and contribution, but which also depends upon predicate liability under § 115B.04. Section 115B.08 allows a party held jointly and severally liable under Section 115B.04 to have the trier of fact apportion liability among the parties. However, Section 115B.08 does not independently establish liability for any party, but rather calls for apportionment of the liability established under Section 115B.04. Also, plaintiff has not been "held" liable for the types of costs specified in Section 115B.04, but rather has voluntarily elected to undertake remedial investigations and action. Thus, giving full meaning to the plain language of the statute, the procedural predicate for invoking Section 115B.08 does not exist. Since Ashland is not liable for a private party's remedial costs under Section 115B.04 and plaintiff has not been held liable under that statute, there is no basis to allocate plaintiff's remedial costs to Ashland under Section 115B.08.

---

> We recently declined the invitation to disregard the plain meaning of the words of a statute where it was argued that the plain meaning would produce an absurd result. We stated that "where the intention of the Legislature is clearly manifested by plain and unambiguous language, we have neither the need nor the permission to engage in statutory interpretation." *Mut. Serv. Cas. Ins. Co. v. League of Minn. Cities,* 659 N.W.2d 755, 760 (Minn. 2003). We concluded that we could disregard a statute's plain meaning only in rare cases where the plain meaning "utterly confounds a clear legislative purpose." *Id*. at 761-72.

*Hyatt*, 691 N.W.2d at 827. *See also, U.S. Specialty Ins. Co. v. James Courtney Law Office, P.A.,* 662 N.W.2d 907, 910 (Minn. 2003); *Boelter v. City of Coon Rapids,* 67 F. Supp.2d 1040, 1045 (D. Minn. 1999). *See also* Minn. Stat. §§ 645.08(1), 645.18.

Plaintiff's opportunity to obtain reimbursement for remedial costs is addressed elsewhere in MERLA, specifically in Minnesota Statutes Section 115B.17, subdivision 19. The Minnesota Legislature added this provision to MERLA in 1997, allowing the MPCA to reimburse parties who are willing to implement response actions for certain actions and in certain circumstances. The following provision is specifically pertinent to the present matter: "Reimbursement may be provided *only for the cost of conducting remedial design and constructing remedial action* pursuant to the terms of the settlement." Minn. Stat. § 115B.17, subd. 19(a). Such reimbursements are available only in connection with settlements with the agency, and subdivision subparts 19(b) and (c) set forth several additional requirements. For example, subdivision 19(c) conditions such reimbursements upon determinations by the MPCA that there are one or more persons who meet any of several criteria, including, among others, (1) persons who are responsible but insolvent, (2) persons who are responsible but unwilling to participate, and (3) persons who are responsible but unidentified. "The agency may agree to reimburse any amount which does not exceed the amount that the agency estimates may be attributable to the liability of responsible persons who are not parties to the settlement." Minn. Stat. § 115B.17, subd. 19(a). Thus, MERLA allows a private party to obtain reimbursement for the shares of remedial costs attributable to other responsible parties who are insolvent, recalcitrant, or otherwise not contributing, but this recovery is to be determined by the MPCA from an administrative fund, not in cost recovery litigation. The statute provides that any reimbursements by the agency are to be made "as a matter of agency discretion in the exercise of its enforcement authority." Minn. Stat. § 115B.17, subd. 19(d).

The fact that the MERLA program limits private party cost recovery to removal actions is echoed (and made even more explicit) in Section 115B.17, subdivision 12, which refers to the

fact that, "*for the purpose of permitting a* political subdivision or *private person to recover* response costs" in certain circumstances, the "*agency* may authorize the political subdivision to take removal or remedial actions or *may authorize the private person to take removal actions*."[15] Thus, the Legislature specified again that a private person's cost recovery would be limited to *removal* costs, and did not authorize a private person to recover remedial costs. Thus, plaintiff's costs, being remedial costs, not removal costs, are not recoverable.

**MERLA Definitions of Removal and Remedial Action**

Given that there is a distinction between removal and remedial action for purposes of cost recovery, it becomes important to understand the difference between the two types of actions. MERLA defines the terms "Remedy or remedial action," "Remove or removal," and "Respond or response." Minn. Stat. § 115B.02, subds. 16, 17 and 18. The terms "Respond or response" mean "remove, removal, remedy and remedial action." Thus, a "response" can be either a removal or a remedy. Minn. Stat. § 115B.02, subd. 18.

The terms "remove" or "removal" are defined in Section 115B.02, subdivision 17 as "(a) The cleanup or removal of a released hazardous substance . . . from the environment, (b) Necessary actions taken in the event of a threatened release of a hazardous substance . . . into the environment, (c) Actions necessary to monitor, test, analyze, and evaluate a release of a hazardous substance . . ., (d) Disposal or processing of removed material; or (e) Other actions to minimize or mitigate damage to the public health or welfare or the environment which may otherwise result from a release or threatened release." Other than formatting changes, this

[15] (Emphasis added). Indeed, the Legislature took pains to explicitly confirm in the last sentence of this subdivision that any person may undertake either removal or remedial actions, but this did not mean that cost recovery applied to remedial actions. However, permission to undertake remedial actions is not the same thing as authority to seek cost recovery for those remedial actions.

definition tracks the definition of the same terms provided under CERCLA, 42 U.S.C. § 9601(23).

The terms "remedy" or "remedial action" under 115B.02, subd. 16, mean those actions consistent with a permanent remedy taken instead of or in addition to removal actions in the event of a release "to prevent, minimize or eliminate the release in order to protect the public health or welfare or the environment." The statute provides that remedial action includes, but is not limited to: "(a) Actions at the location of the release such as . . . cleanup of released hazardous substances, . . . *or contaminated materials*, . . . diversion, . . . dredging or excavations, . . . collection of leachate and runoff, . . . and any monitoring and maintenance, and institutional controls reasonably required to assure that these actions protect the public health and welfare and the environment . . .." (emphasis added).[16]

On a superficial level, these definitions of "removal" and "remedy" appear to overlap to some degree. However, the Legislature distinguished between the two for purposes of private cost recovery and administrative reimbursement by the MPCA, and a careful reading offers valid insights to the distinctions. For example, both definitions use the word "cleanup" and both refer to monitoring. However, reading these words in context reveals differences even as to their apparent overlap. For example, although both definitions use the term "cleanup," for "removal,"

[16] Other than formatting changes, this definition essentially tracks the definition provided under CERCLA, 42 U.S.C. § 9601(24). The original version of MERLA's definition was copied directly from CERCLA. In 1997, the Minnesota Legislature inserted ", and institutional controls" to this definition. Previously, the phrase read "any monitoring and maintenance reasonably required to assure that these actions protect the public health and welfare and the environment . . .." The amendment adding "institutional controls" ensures that such measures would be regarded as acceptable components of a remedy. Thus, considering the context for the change, it appears that the "reasonably required" phrase still modifies the term "monitoring and maintenance." In other words, monitoring that is reasonably required to assure that other remedial actions will protect and are protecting the public health and the environment are included within the definition of remedial actions.

the term "cleanup" applies only to "a released hazardous substance," Minn. Stat. § 115B.02, subd. 17(a), whereas for "remedy," the reference to "cleanup" extends to "released hazardous substances" and also to "contaminated materials." As becomes clear with any review of the investigation work plans and reports,[17] the cleanup at the Plaintiff's property will extend not only to multiple hazardous substances but will include, and be dominated almost entirely by, efforts to remediate contaminated soils and groundwater.

In the same vein, although both definitions use the term "monitor," the purpose for monitoring differs in each context. For "removal," the term includes actions to "monitor, test, analyze, and evaluate a release or threatened release of a hazardous substance . . .." Minn. Stat. § 115B.02, subd. 17(c). For "remedy," the monitoring is "reasonably required to assure that these actions [actions consistent with a permanent remedy] protect the public health and welfare and the environment." Thus, a removal is oriented to a more focused evaluation of the release itself, whereas a remedy is oriented to the broader assurances necessary to remediate the release.

**NCP Guidance on Removal and Remedial Action**

Since the MERLA definitions for "removal" and "remedial" actions are copied substantially from CERCLA definitions, one can obtain guidance from CERCLA authorities for the meaning of the distinction between the two terms, further informing the distinction drawn for MERLA cost recovery. The EPA has promulgated guidance as to both removal actions and remedial actions in the National Contingency Plan.[18]

---

[17] *See, e.g.,* O'Donnell Affidavit, ¶¶ 45, 52, 53, 55, 57 to 66, 68 to 72, 74, 76 to 79, 80 to 91 and accompanying exhibits.

[18] This guidance is also germane because the EPA and the MPCA delineated the respective roles and responsibilities as between themselves with respect to contaminated sites, in a document entitled "Superfund Memorandum of Agreement," dated December 2, 1994. O'Donnell Affidavit, Exhibit 54. In an addendum dated May 3, 1995, the MPCA and the EPA

For a removal action under the NCP, the steps included are limited and expeditious. They include a Removal Site Evaluation (40 CFR 300.410) and a Removal Action (40 CFR 300.415). Removal actions are to "begin as soon as possible to abate, prevent, minimize, stabilize, mitigate, or eliminate the threat to public health or welfare of the United States or the environment." 40 CFR 300.415(b)(3).[19] Under 40 CFR 300.415(b)(5), removal actions shall be terminated after $2 million has been obligated for the action or 12 months have elapsed from the date that removal activities begin on-site, unless there is a determination that (i) there is an immediate risk to public health or the environment; and continued response actions are immediately required to prevent, limit, or mitigate an emergency, and such assistance will not otherwise be provided; or (ii) continued response action is otherwise appropriate and consistent with the remedial action to be taken. Under 40 CFR 300.415(g), if a removal action will not fully address the threat and the release may require remedial action, there shall be an orderly transition from removal to remedial response activities.

In contrast to the relatively expeditious and preliminary nature of a removal assessment, an investigation for a remedial action includes many more formal and fully developed investigation, planning and implementation steps. These include a Remedial Preliminary Assessment (PA) (40 CFR 300.420(b)), a Remedial Site Inspection (SI) (40 CFR 300.420(c)) and a Remedial Investigation/Feasibility Study (RI/FS) (40 CFR 300.430). The NCP provides principles to help determine when remediation provides the appropriate approach, including: "Sites should generally be remediated in operable units when early actions are necessary or

agreed to promote appropriate investigations and cleanups by parties participating in the VIC program to facilitate "Brownfield" revitalization. O'Donnell Affidavit, Exhibit 55.

[19] A list of removal actions is provided at (e)(1)-(8), such as fences, drainage controls, stabilization of berms, capping to reduce migration, using chemicals to retard or mitigate spread, excavation or removal of highly contaminated soils from drainage areas to reduce spread or direct contact.

appropriate to achieve significant risk reduction quickly, when phased analysis and response is necessary or appropriate to achieve significant risk reduction quickly, when phased analysis and response is necessary or appropriate given the size or complexity of the site, or to expedite the completion of the total site cleanup." 40 CFR 300.430(a)(1)(ii).

Extensive guidance is given for remedial investigations and related work. A remedial investigation/feasibility study (RI/FS) generally includes project scoping, data collection, risk assessment, treatability studies, and analysis of alternatives. 40 CFR 300.430(a)(2). The NCP addresses numerous topics for an RI/FS. *See e.g.,* (40 CFR 300.430(b)( Project Scoping), 40 CFR 300.430(c)(Community Relations), 40 CFR 300.430(d)(Remedial Investigations (RI)), and 40 CFR 300.430(e)(Feasibility Studies). The Remedial Design/Remedial Action (RD/RA) stage includes the development of the actual design of the selected remedy and the implementation of the remedy through construction. A period of operation and maintenance may follow the Remedial Action activities. 40 CFR 300.435(a).

**MERLA Procedural Distinctions Regarding Removal and Remedial Actions**

In light of the foregoing definitions and implications of the comparison between removal and remedial actions, it becomes understandable why the Minnesota Legislature also distinguished procedurally between removal and remedial actions for purposes of action by the agency or the MPCA commissioner. Minn. Stat. § 115B.17, subdivision 1. Per subdivision 1(a), "the agency may take any removal or remedial action relating to the hazardous substance," but before doing so, the agency is to take certain steps set forth in that subdivision. By comparison, under subdivision 1(b), "the commissioner may take removal action which the commissioner deems necessary to protect the public health or welfare or the environment if the commissioner determines that the release or threatened release constitutes an emergency requiring immediate

action." Before doing so, the commissioner is to make reasonable efforts to follow the steps laid out in subdivision 1(a).[20] In a similar vein, the Legislature required the commissioner to give notice to the public and to solicit comments before selecting a remedial action, Section115B.17, subd. 2b, whereas there is no comparable provision requiring such notice or comments for removal actions. Priorities were to be established for purposes of taking remedial action upon the enactment of MERLA, but such priorities were only required to the extent practicable for removal actions. Section 115B.17, subd. 13. These provisions indicate that the Legislature considered removal actions often to be associated with emergencies that warrant expedited action, whereas remedial actions are to entail more deliberate action and more formal compliance with procedural protocols.

Recognizing that time may be of the essence and responses may be short in duration for removal actions provides a logical basis for the Legislature to decide that the MPCA should not be expected to manage reimbursements for removal costs and, therefore, to allow cost recovery for such costs to proceed in court actions. But for private party remedial actions, MERLA establishes more methodical procedural mechanisms subject to the oversight of the MPCA. Moreover, MERLA explicitly assigns to the MPCA authority and discretion to determine whether to reimburse remedial costs incurred by a private party in conjunction with a settlement between the agency and the private party. MERLA does not provide a role for any court to address remedial costs incurred by a private party. This approach enhances the ability of the MPCA to ensure that remedial work is done expeditiously, without the confusion and delays of litigation about remedial costs.

[20] Similarly, under Section 115B.18, subdivision 3, a request for emergency removal action shall be made by the commissioner, whereas other requests for response action shall be made by the agency.

**Judicial Decisions Classifying Removal and Remedial Actions**

State court decisions have not explored the distinction between removal and remedial actions,[21] but there are significant federal cases that illuminate the distinction. These cases tend to be fact-specific, but two cases provide relevant and cogent guidance for the matter before the Court.

In *State v. Kalman W. Abrams Metals, Inc.,* 155 F.3d 1019 (8th Cir. 1998), the court reviewed a summary judgment order which disallowed the State of Minnesota's cost recovery claims against corporations. The court of appeals determined that the agency's action would be treated as a remedial, not removal, action (and thus was to be compared with the more stringent procedural requirements for remedial actions under the National Contingency Plan ("NCP")).[22] The court explained: "The EPA regulations distinguish between removal actions – those taken to counter imminent and substantial threats to public health and welfare – and remedial actions, which are longer term, more permanent responses." *Id.,* at 1024. The court agreed with the

[21] The opinion in *Musicland Group, Inc. v. Ceridian Corporation,* 508 N.W.2d 524, 530 (Minn. App. 1994) noted the distinction of interest in this case. The court observed: "a private party may recover *removal* costs under Section 115B.04. (The state, political subdivisions of the state, and the United States may recover removal *and* remedial costs.)" (emphasis in original). However, the case did not test the question whether an investigation spanning many years and oriented toward permanent remedial action should be classified as a removal or a remedial action. Rather, the court overruled Control Data's objection that Musicland's damages were neither reasonable nor necessary removal costs under MERLA. The court explained that Musicland's actions to alter its dewatering process to allow the dewatering to continue without spreading the contamination on an adjacent property were both reasonable and necessary to minimize the damage to the public health and welfare of the environment. Recovery was also allowed under Section 115B.05. *Id.* at 533.

[22] Under CERCLA, liability extends to either removal or remedial action costs incurred by a private party. CERCLA § 107(a). However, many federal courts have examined the difference between removal and remedial actions under CERCLA because such distinctions have a bearing on compliance with the NCP and certain statutes of limitations questions. Since the federal decisions have barred cost recovery on the basis of these distinctions, albeit in a slightly different context, the stakes are comparable to those in this case. Accordingly, inasmuch as MERLA definitions follow the CERCLA definitions, these federal cases can provide guidance for interpretation of MERLA.

district court that it was appropriate to hold the agency to NCP standards for remedial action due to "the permanent nature of the […] cleanup and the leisurely manner in which MPCA dealt with the problem." *Id.*[23] The EPA had conducted a site assessment in 1986 at the state's request. In 1990, the MPCA issued a Request for a Response Action to a private party and also determined that he would not comply. The MPCA commenced a cleanup in 1991 and the work continued for some period of time, the precise duration of which cannot be gleaned from the court's opinion. This five or six year process was described by the court as "leisurely."

In *Public Service Company of Colorado v. Gates Rubber Company,* 175 F.3d 1177 (10th Cir. 1999), the court held that a private landowner who incurred expenses in responding to contamination of its land had undertaken a remedial, not a removal, action and was not entitled to presumption of compliance with NCP based on the state's involvement. The appellate court affirmed summary judgment for the defendant. The court explained:

> In 1989, Barter, concerned about EPA's interest in the Site, retained ATEC Environmental Consultants (ATEC) to do a preliminary environmental assessment. ATEC's report noted the presence of PCBs and identified high levels of lead in some of the soil it sampled. Subsequently, PSCO undertook its own investigation and cleanup and, as noted, retained USPCI to develop and implement a remedial plan in 1992, well before the state's involvement. USPCI's report, entitled "Proposal for Remedial Action," specifically addresses lead contaminated soil removal with on-site stabilization and rail transportation. Although a removal action involves a prompt response to a release or threatened release of hazardous substances, PSCO studied the site from at least 1991 when it and Barter entered into an environmental agreement until 1992 when ERM filed a second preliminary assessment. By its own assertion, PSCO expended approximately $9 million and did not complete the cleanup until 1996, at least four years after it began. PSCO intended to remediate the Site to sell it and recoup its cleanup costs. That is, PSCO intended to effect a permanent remedy. Although PSCO "removed" and "excavated" soils and buried storage drums, neither of those acts alone nor their particular labeling transforms the cleanup into a removal action.

---

[23] The MPCA had made no determination as to which type of action was involved.

The factual scenarios in the *Kalman* and *Gates* cases provide appropriate points of comparison for the remedial investigation conducted by plaintiff in this matter. Although the vocabulary a party uses in its documents is not necessarily dispositive, in this case a large volume of documents prepared or authorized by plaintiff spanning many years all refer to the remedial nature of the ongoing investigation. Courts generally regard longer investigations and investigations oriented to a permanent remedy to be remedial investigations.[24] Duration standing alone may not necessarily be the only factor, but the pace of the investigation in this case can fairly be described as "leisurely." Also, this case reveals many other factors all of which point to the proper characterization of plaintiff's work as remedial.

**Pleadings and Factual Record**

Plaintiff's complaint asserts that "Soo Line implemented a number of *remedial* investigations" at its property. Complaint ¶ 17 (emphasis added). Also, the complaint asserts that plaintiff anticipates that contamination at its property "will need to be *remediated* at significant cost and expense." Complaint ¶ 18 (emphasis added). Plaintiff alleges that "the Defendants are strictly liable to Soo Line, jointly and severally, for all past and future *response* costs . . . incurred by Soo Line associated with the Site." Complaint ¶ 57 (emphasis added). Plaintiff's effort to impose liability upon Ashland for "response" costs, thereby implying liability for plaintiff's "remedial" costs, is not supported by the language of MERLA. Plaintiff has

---

[24] In *General Electric Company v. Litton Industrial Automation Systems, Inc.,* 920 F.2d 1415 (8th Cir. 1990) the court ruled that a response action was a removal and was consistent with the NCP. Among other things, "Litton also argue[d] that only short-term, temporary responses can be considered removals and that GE's response was neither. *See Exxon Corp. v. Hunt,* 475 U.S. 355, 360 (1986); *United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726, 731 (8th Cir. 1986)("NEPACCO")." The court held that GE's response was not too time-consuming to be considered a removal, as the cleanup took a little more than a year, with work performed in three segments over a span of five different months."

correctly characterized its costs as remedial costs, not removal costs. Remedial costs incurred by a private party fall outside the scope of MERLA liability and are not subject to cost recovery.

Plaintiff has acknowledged explicitly and implicitly that its investigation is a remedial investigation in many documents that it has submitted to the MPCA.[25] Indeed, as recently as February 17, 2005, plaintiff published its "Remedial Investigation Report," which demonstrates the remedial nature of the investigation, and, at a public meeting on that same date, repeatedly referred to its work at the site as "remedial actions."[26] Thus, plaintiff cannot seriously contest its own characterization of its work as remedial. Because of the significance of the issue, however, it seems prudent to explore further the statutory and judicial definitions and interpretations of the pertinent terms in order to interpret the distinction drawn by the Minnesota Legislature.

The record pertaining to plaintiff's investigation of its Shoreham Yard property shows that plaintiff characterized its work as a remedial investigation as early as 1989 and has done so repeatedly since then.[27] Indeed, as long ago as 1996 (eight years after initiating an investigation into the site and four years after discovery of contaminants in the lease area[28]), plaintiff explained that contaminants had already migrated to a depth of some 40 to 45 feet, making soil

---

[25] O'Donnell Affidavit, ¶¶ 41, 45, 52, 53, 55, 57 to 66, 68 to 72, 74, 76 to 79, 80 to 91.

[26] O'Donnell Affidavit, ¶¶ 85 to 90 and Exhibits 87 and 88.

[27] O'Donnell Affidavit, ¶¶ 45, 52, 53, 55, 57 to 66, 68 to 72, 74, 76 to 79, and 80 to 91.

In 1992, the Minnesota Legislature enacted Minnesota Statutes Section 115B.175, which outlines the program for voluntary response actions, provides certain liability protections and establishes certain procedures for voluntary actions. This provision has since been amended from time to time. Section 115B.175 is designed to make it possible for an owner not otherwise responsible to take response actions without incurring liability for prior contamination and also establishes protections for subsequent purchase, etc. However, the section does not relieve those who are otherwise responsible from the liability established under other sections of MERLA. Plaintiff elected in 1994 to participate in the MPCA's voluntary response program to address a large area that encompassed not only the former lease areas but also other areas within Shoreham Yard. Over the years, plaintiff has reaffirmed that voluntary participation.

[28] This discovery occurred no later than June, 1992, as will be discussed below.

excavation impracticable, and did not recommend any interim response action for the unsaturated zone or groundwater.[29] Plaintiff has been engaged in a process that started about sixteen years ago (given initial requests for investigation dating back to 1977, one could say as much as twenty-seven years). Plaintiff has pursued most of its work at the periodic prompting of the MPCA, has engaged in a many-phased analysis for the site, has emphasized the complex nature of the site and its multiple contamination patterns, has identified, described and studied various areas and operable units, has explored steps necessary for the eventual sale of a large portion of the eastern part of Shoreham Yard for commercial redevelopment, and has been discussing and exploring "remedial" measures for years. All of these factors are consistent with plaintiff's long-standing classification of this work as remedial. As of the present time, even after the lengthy investigation, the remedy remains nascent, but plainly this has been an ongoing investigation directed at a permanent remedy, not a short-term, emergency removal action. Plaintiff has spent its dollars on a remedial investigation, not a removal action. Therefore, its costs are not recoverable under MERLA Section 115B.04 subdivision 1(b), which allows a private party to recover costs for removal only, and not costs for remedies.

**Conclusion as to Plaintiff's Remedial Action**

As the Eighth Circuit observed about CERCLA in *Dico, Inc. v. Amoco Oil Company,* 340 F.3d 525 (8th Cir. 2003), "one PRP may bear a disproportionate share of the cleanup costs." [30] The same point applies under MERLA, even though there are many differences between the CERCLA scheme and the MERLA scheme. Just as CERCLA was primarily concerned with

[29] O'Donnell Affidavit, ¶ 63 and Exhibit 60.

[30] Ashland believes that plaintiff has incurred many unreasonable and unnecessary expenses, not because they were necessary to satisfy the MPCA or the NCP for a remedial investigation, but rather to buttress its claims against Ashland. However, any debate about the reasonableness or necessity of plaintiff's investigation is not the basis for the present motion.

ensuring that there would be responses by responsible parties, a similar approach is manifest with MERLA. Plaintiff, as the long-standing owner of this property (during the entire period before, during and after any source of releases of contamination), is exactly a type of party that CERCLA and MERLA designated to be among the responsible parties with strict, joint and several liability. Matters of liability, rights of direct action, contribution and cost recovery opportunities under both statutes are carefully defined, and do not authorize all potential claims that a party might wish to make in private cost recovery lawsuits.

The Minnesota Legislature decided that liability attaches only to "removal costs" and not for "remedial costs" incurred by private parties. The Legislature decided to leave it to the MPCA to determine whether to reimburse plaintiff for its remedial costs under certain specific conditions. The meaning of the statutory language is clear. Counts Five and Six, presenting plaintiff's claims for recovery of its remedial costs, are not allowed in a court action under MERLA and should be dismissed.

## V. STATE COMMON LAW CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

Plaintiff's potpourri of state law claims[31] are barred because plaintiff knew or reasonably should have known that property damages at its Shoreham Facility were caused or contributed to by hazardous substances or pollutants or contaminants released at the former lease areas including the fact that this contamination had affected soil and groundwater at and away from the

[31] The state law claims at issue are Counts Seven (Breach of Contract), Nine (Common Law Indemnity), Ten (Common Law Contribution), Eleven (Negligence), Twelve (Nuisance), Thirteen (Negligence) and Fourteen (Strict Liability).

former lease areas, not later than June 25, 1992, more than six years before the effective date of the tolling agreement (March 4, 1999).[32]

June 25, 1992, is the date of a report prepared by one of plaintiff's consultants, for submission to the MPCA, and entitled "Phase II Remedial Investigation Report" (1992 Report).[33] Pertinent excerpts include:

- "In summary, . . . *one newly discovered area (lease area) of soil and ground water contamination [has] been identified* within the study area." Exhibit 48, p. 2 (MPCA000809).

- "The final area of concern is located along Central Avenue between 29th Avenue and 30th Avenue. This area is shown in Figures 3 and 4 and is referred to as the lease area. This area was leased by Soo Line to several companies from May 1913 to August 1979. Operations on the leased property have included a coal and wood fuel yard, a fuel oil facility, a lumber yard, and a chemical blending plant. A gasoline service station may have also been located on a portion [sic] this property. Since the property was vacated, the buildings, above ground storage tanks, and other structures have been removed and the area landscaped." *Id.*, p. 3 (MPCA000810).

- [Groundwater] "All 19 wells did contain detectable levels of either THC as fuel oil, THC as gas, or unidentified volatile organic compounds (Table 6). * * * *Fuel oil, gasoline, toluene, ethylbenzene, and xylenes were identified within the lease area and the collector pan area*. Also, the laboratory identified peaks of lower and higher boiling point organic compounds not typical of fuel oil for all 15 samples (Table 6 and Appendix D)." *Id.,* pp. 12-13 (MPCA000819 – 820).

- [Extent of Soil Contamination]: "*Shallow soil contamination exists within . . . the lease area*." * * * "The soil contamination detected in the soil sample was identified as gasoline and had the highest concentrations of BTEX compared to any other soil sample collected to date. *The shallow depth of contamination and the high concentrations of volatile organic compounds strongly indicate that the source of contamination was from the former tanks located on the leased property*." *Id.*, pp. 13-14 (MPCA000820-821).

---

[32] Since the statute of limitations is sufficient to dispose of the state law claims, it is unnecessary to address other deficiencies in plaintiff's claims. Ashland reserves all such other defenses, including the defense that some or all of plaintiff's claims are barred by the application of a separate statute of limitations and repose found in Minnesota Statutes Section 541.051.

[33] The 1992 Report is attached to O'Donnell Affidavit as Exhibit 48.

- [Extent of Groundwater Contamination]: "[*T*]*he higher boiling point compounds detected in the lease area are believed to be contributing to the off-site contamination* found in MW-317." *Id.*, p. 15 (MPCA000822).

(emphasis added). Figures 12, 14, 17, which accompanied the 1992 Report, illustrate soil contamination at shallow, medium and deep levels, respectively, within and around the footprint of the lease area. *Id.*, pp. MPCA000847, MPCA000849 and MPCA000852.

Minnesota's general statute of limitations for contract and tort actions is Minnesota Statutes Section 541.05, which provides for a six-year period of limitations. The general rule in Minnesota is that a cause of action accrues at the time that an action can be commenced. *Pettibone v. Cook County,* 120 F.2d 850, 854 (8th Cir. 1941); *see also Leisure Dynamics, Inc. v. Falstaff Brewing Corp.,* 298 N.W.2d 33, 37 (Minn. 1980)("The general rule in Minnesota is that a statute of limitations begins to run from the time an action can be commenced."); *Dalton v. Dow Chemical Co.,* 158 N.W.2d 580 (Minn. 1968)("Under our statutes it has been determined that ignorance of a cause of action not involving continuing negligence or trespass, or fraud on the part of the defendant, does not toll the accrual of a cause of action. … The period within which the action must be brought commences when the right of action accrues.") Since Ashland's land lease terminated in 1982, and Ashland has not occupied or used plaintiff's property since then, most state law claims would have expired by 1988 under state law.

However, CERCLA expressly preempts state statutes of limitations in any action asserting claims that arise from property damage caused by hazardous substances. 42 U.S.C. 9658(a)(1)-(2). For such cases, CERCLA provides that any applicable limitations period shall commence no earlier than "the federally required commencement date." The term "federally required commencement date" is, in turn, defined as:

> the date the plaintiff *knew (or reasonably should have known)* that the . . . property damages were caused or contributed to by the hazardous substance or pollutant or contaminant concerned.[34]

Under the federal discovery rule, knowing the fact of contamination is enough to trigger the statute of limitations, and it is not necessary to know the specific contaminants of each defendant or the identity of all responsible parties. *See, e.g., Seneca Meadows, Inc. v. ECI Liquidating, Inc.,* 983 F. Supp. 360, 364 (W.D.N.Y. 1997), which explains:

> It is not necessary, as SMI suggests, for a plaintiff to know the identity of each defendant's specific contaminants that damaged the property before the statute of limitations begins to run; it is only necessary for plaintiff to know "the fact of the contamination." *Reichhold Chemicals, Inc. v. Textron, Inc.*, 888 F. Supp. 1116, 1126 (N.D.Fla.1995); *see also Presque Isle Harbor Dev. Co. v. Dow Chem. Co.*, 875 F. Supp. 1312, 1319 n. 11 (W.D.Mich.1995) (holding that actual knowledge of each specific hazardous substance, pollutant, or contaminant is not required for the limitation period under § 9658 to begin to run); *Torrance Redevelopment Agency v. Solvent Coating Co.*, 763 F. Supp. 1060, 1066-67 (C.D.Cal.1991) (finding that such specific knowledge is not required in order to trigger accrual of the cause of action). It is also not necessary for plaintiff to know the identity of all individuals responsible for the contamination before the statute of limitations begins to run. *Reichhold Chemicals*, 888 F. Supp. at 1126 (rejecting plaintiff's argument that the CERCLA commencement date is the date plaintiff learned of the identity of the other tortfeasor). Once SMI discovered both the injury and its cause, it was under an obligation to ascertain the responsible parties and commence this action within the applicable statute of limitations.

The 1992 Report leaves no room for doubt that plaintiff was aware, not later than June 25, 1992, that the lease area was a source of contamination, including volatile organic chemicals, which affected soils and groundwater, including offsite groundwater. The 1992 Report referred to operations of prior tenants at the former lease areas, specifically including the chemical blending plant. Given the date of this document, it is a moot point to debate whether plaintiff

[34] 42 U.S.C. § 9658(b)(4)(A) (emphasis added). *See also Union Pacific v. Reilly Indus.*, 215 F.3d 830, 840 (8th Cir. 2000); *Soo Line v. B.J. Carney & Co.,* 797 F. Supp. 1472 (D. Minn. 1992).

arguably should have been aware of this issue earlier than mid-1992. The statute of limitations ran on all state law claims not later than June 25, 1998.

## VI. CONCLUSION

*Cooper v. Aviall*, and its plain-meaning interpretation of CERCLA Section 113, mandates the dismissal of the Section 113 claims. This Court's prior analysis of CERCLA Section 107, coupled with the evidence that plaintiff is not an innocent owner, demonstrates that the Section 107 claim must be dismissed. In addition, the plain language of MERLA, coupled with the undisputed evidence that plaintiff has been engaged in a remedial investigation for many years, requires the dismissal of plaintiff's MERLA claims. Finally, the documentation that plaintiff had knowledge of its state law claims no later than June 25, 1992, compels the dismissal of plaintiff's state common law claims by virtue of a governing statute of limitations.

Dated: March 25, 2005

**GREENE ESPEL, P.L.L.P.**

s/ William P. Hefner
Larry D. Espel, Reg. No. 27595
William P. Hefner, Reg. No. 258349
200 S. Sixth Street, Suite 1200
Minneapolis, MN 55402
(612) 373-0830

**CHILTON YAMBERT PORTER & YOUNG, LLP**
Larry J. Chilton, IL Reg. No. 6185236
Joseph Vallort, IL Reg. No. 6209211
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
(312) 460-8000

Attorneys for Defendant Ashland Inc.