IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

Soo Line Railroad Company
a Minnesota corporation,

Plaintiff,

v.

Ashland Inc.,
a Kentucky corporation,
and Murphy Oil USA, Inc.,
f/k/a Murphy Corporation,
a Delaware corporation,

Defendants.

Case No. CV 01-1628 ADM/AJB

**AFFIDAVIT OF LAURA M. O'DONNELL IN SUPPORT OF ASHLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

STATE OF MINNESOTA)
: ss
COUNTY OF HENNEPIN)

Laura M. O'Donnell being duly sworn, deposes and says:

1. I am a paralegal with the law firm of Greene Espel, P.L.L.P., attorneys for Ashland Inc. ("Ashland") in the above matter. I make this Affidavit in support of Ashland's Motion for Partial Summary Judgment.

2. The purpose of this Affidavit is to present copies of documents and deposition excerpts from the record of this case in support of Ashland's Motion for Partial Summary Judgment.

3. This Affidavit is presented with a chronological organization. Thus, references to the documentary exhibits will be made in the order of the dates of the documents. Deposition excerpts will be placed in the sequence by using the dates of the period of time that is the subject

of the testimony. In many instances, the deposition subject dates are indefinite and a reasonable effort is made to place the testimony in an approximate context.

4. This Affidavit includes exhibits that address several subjects. One of these is the purchase, storage, use and release of chlorinated solvents by Plaintiff at Shoreham Yards. The second is available information concerning the activities of Rocket Products Company ("Rocket Products"). The third is information about the termination of Ashland's lease. The fourth is information about the investigations of the site by Plaintiff. This fourth category encompasses the largest set of documents.

5. The following list explains which paragraphs relate to which of these four topics:

- Soo Line's chlorinated solvents: 20, 31, 39 – 40, 46, 48 – 51, 53 – 54, 56, 64, 86 - 88
- Rocket Products information: 6 – 10, 13, 16
- Ashland's lease commencement and termination and acquisition of Rocket Products' assets: 11 – 12, 14 – 19, 27, 30, 33 – 38, 73
- Soo Line's remedial investigations: 21 – 26, 28 – 29, 32, 41 – 45, 47, 52 – 53, 55, 57 –72, 74 – 91

6. Rocket Products and Soo Line Railroad Company ("Soo Line") entered into a lease regarding a portion of Shoreham Yard on or about May 26, 1958. Attached as Exhibit 1 to this Affidavit is a copy of the "Lessee's Copy" of the lease, dated May 26, 1958, between the Minneapolis, St. Paul & Sault Ste. Marie Railroad Company, l/k/a Soo Line, and Rocket Products which Soo Line produced through discovery. This document is Bates labeled SLR016443 – 45. The lease described, and appeared to show, in Attachment A, an area that includes what is currently referred to as "Area A3" (the bottom segment of VIC Site #5080 referred to as "Area A (Former Lease Area)"). According to the second numbered paragraph of he lease, Rocket Products leased the area in question for the purposes of operating a "chemical

blending plant and office." The "To Have and To Hold" clause that precedes that paragraph stated that the lease is to last for a period of one year, and from year-to-year thereafter, until one party or the other terminates the lease subject to its provisions.

7. Soo Line and Rocket Products renewed their lease on or about August 1, 1964. Attached as Exhibit 2 to this Affidavit is a copy of the "Lessor's Copy" of a lease, dated August 1, 1964, between Soo Line Railroad and "Rocket Products, Inc.," which Soo Line produced through discovery. This document is Bates labeled SLR016439 – 41. This lease appears to differ in at least a few respects from the previous lease, attached as Exhibit 1. First, there is the change in the names of the parties: "the Minneapolis, St. Paul & Sault Ste. Marie Railroad Company" was now the "Soo Line Railroad Company"; "Rocket Products, Company," was now "Rocket Products, Inc." The length of the leased area in this lease appears to be approximately 28 feet shorter than in the 1958 lease. Specifically, the northern border of the Rocket Products leased area existed at 395 feet north of the southerly line of "Section [2-29-24W]" under the 1958 lease, whereas the northern Rocket Products border under this lease existed 367 feet north of Section 2-29-24W's southerly line. As before, however, Rocket Products' intended use of the leased area remained "chemical blending plant and office."

8. A permit issued to Rocket Products provides a snapshot of some products stored by Rocket Products at its chemical blending plant. Attached as Exhibit 3 is a document dated December 12, 1960, which is a Minneapolis Fire Department "Permit to Install and Maintain Gasoline Filling Station, Bulk Storage Plant, or Gasoline Storage Installation for Private Use" for Rocket Products, Inc. This document, was obtained from the Minnesota Pollution Control Agency ("MPCA") and is Bates labeled MPCA005090-5091. This document describes ten bulk tanks, with the following contents: lacquer thinner, TSO-propel alcohol, mineral spirits, VM&P,

xylol, toluol, lacquer diluent, acetone, styrene and empty. A diagram that accompanied this permit indicated the same information.

9. According to testimony provided by its former officers and employees in prior litigation, Rocket Products sold a number of different chemicals. Attached as Exhibit 4 are transcript excerpts from depositions taken of former Rocket Products President Neal Armstrong on July 8, 1982 and February 24, 1983. Specifically, Exhibit 4 includes Mr. Armstrong's July 8, 1982 testimony, pages 1-3 and 28 (Bates labeled RP0002 – 4, RP00029) and Mr. Armstrong's February 24, 1983 testimony, pages 1-3, 4, 24 and 43 (RP000139 – 141, 162 and 180) of. In his deposition, Mr. Armstrong testified that Rocket Products sold products such as styrene (July 8, 1982, p.28, RP00029, lines 14 – 15), methylene chloride (February 24, 1983, p. 24, RP00162, lines 1 – 8) and acetone (February 24, 1983, p. 42, RP00180, lines 4 – 9).

10. According to former Rocket Products salesman David Hargraves, Rocket Products sold "[a]romatics, [a]liphatics, [k]etones, [c]hlorinated solvents, [g]lycol ethers, [and] [e]sters." Attached as Exhibit 5 to this are excerpts from Mr. Hargraves' deposition testimony, which was taken on December 15, 1983. Specifically, Exhibit 5 includes pages 1 – 5 of Mr. Hargraves' testimony, which are Bates labeled RP00227 – 31.

11. In a deposition taken in this litigation on April 10, 2003, Marshall Sher, a former Ashland employee, recalled a meeting between himself and Mr. Armstrong that transpired sometime in late 1972 or early 1973. Attached as Exhibit 6 are copies of pages 1 – 3, 116 – 120, 136 – 137 and 140 – 141 of Mr. Sher's deposition testimony.

12. Mr. Sher discussed the upshot of his meeting with Mr. Armstrong with Harvey Skaggs, another former Ashland employee, upon his return from that meeting:

> And he [Harvey Skaggs] said, "Well, what should we do? And I said, "Buy it from the bankruptcy court. And it didn't take too long before he went bankrupt and we bought it from the bankruptcy court. We only bought the business, not the property, the land, I should say. He had a little office building and a building where they filled some drums, and they had some tanks and a little bit of land. It was not a lot of land. It was a pretty small operation. But the kind of business we were thinking of starting in Minneapolis was going to be a small business, and I thought we could get it started, clean it up, and fix it up, and start it the best we could and get a business in Minneapolis moving, which is what we did, as far as can I recall.

Exhibit 6, pp. 118:24 – 119:13.

13. Mr. Sher recalled the types of products Rocket Products sold:

> Q. Do you recall what products they were selling?
>
> A. The common type products, you know, toluene, xylene, I think he sold some chlor and some percs. He may have sold dry cleaners. I don't remember. Mineral spirits, lacquer thinner type of products, just pretty much run-of-the-mill type stuff, nothing real exotic. I mean, if you asked me what he had in his tank, I would have to guess. I mean, I would guess those common-type products.

*Id.*, pp. 136:25 – 137:8.

14. Mr. Sher went on to recount a second trip, at which time he advised Mr. Armstrong that Ashland would not negotiate directly with Rocket Products about a sale of the business:

> Q. By the time you went and met with Mr. Armstrong the second time, was Rocket Products in bankruptcy?
>
> A. Not that I was aware of.
>
> Q. And the purpose of that trip, that second trip --
>
> A. Was basically just to tell him we were not going to negotiate on a direct basis with him.

*Id.*, pp. 140:22 – 141:3.

15. Ashland and Soo Line entered into a lease dated March 1, 1973, for a parcel of property to be used as a "chemical blending plant and office." Given other documents, it appears likely that this lease may have been executed at some date after March 1, 1973. Attached as Exhibit 7 is a copy of this lease, which was attached to the complaint.

16. Ashland's assessment of the work needed to refurbish the Rocket Products buildings and tanks, as well as its discussions with Soo Line about leasing the property, were documented in a memorandum dated April 19, 1973. Attached as Exhibit 8 to this Affidavit is a copy of the memorandum, which Ashland produced through discovery. This document is Bates labeled ASH000177 – 78.

17. Ashland explained the business case for its interest in starting a "grass roots" operation in the Minneapolis area at a modest cost in a memorandum dated May 18, 1973. Attached as Exhibit 9 to this Affidavit is a copy of the memorandum, which Ashland produced through discovery. This document is Bates labeled ASH000175.

18. As of July 19, 1973, Ashland had concluded the purchase of assets from the Rocket Products bankruptcy trustee. Attached as Exhibit 10 to this Affidavit is a copy of a memorandum describing this acquisition, which Ashland produced through discovery. This document is Bates labeled ASH000174. The memorandum states:

> We purchased certain physical assets from the referee in bankruptcy from the defunct Rocket Products.
>
> These assets are located at 2900 Central Avenue, N.E., Minneapolis, Minnesota. At the present time we are upgrading the facilities and will operate an IC&S type business, starting approximately August 15, 1973. We lease this property from the Soo Line Railroad and it consists of one office building, one small scale house and warehouse building, and 12 tanks totalling 240,000 gallons of storage.

> Our initial manpower table will consist of one salesman, one office girl, and one warehouseman-driver.

19. Charles Stein, the first manager for Ashland's new operations in Minneapolis, did not use any Rocket Products customer list. Attached as Exhibit 11 are excerpts from deposition testimony Mr. Stein provide in this litigation on June 20, 2003, including pages 1 – 3, 196 – 97 and 199. Specifically, Mr. Stein testified as follows regarding his familiarity with Rocket Products' customer lists:

> Q. Can you list for me any of Rocket Products' customers?
>
> A. No.
>
> Q. Why not?
>
> A. Because I never had -- never saw any of their records.
>
> Q. You did not?
>
> A. No.
>
> Q. Did you ever see a Rocket Product customer list?
>
> A. No.
>
> Q. Are you aware of any of the customers that you sold to in fiscal year '73 and fiscal year '74 and fiscal year '75 as being Rocket Product customers?
>
> A. We didn't have any sales in fiscal year '73. Fiscal year '74 started October 1st of '73. The answer to your question is no.

Exhibit 11, pp. 196:13 – 197:6. Mr. Stein later elaborated on his lack of knowledge regarding Rocket Products:

> Q. Do you know the volume of product that Rocket was selling in a year?
>
> A. No. I paid no attention to Rocket Products. Rocket Products, to me, was an abstract because it was defunct before I ever got there. It meant nothing to me.
>
> Q. When you arrived at -- when you walked into the laboratory/office building before all the junk had been taken out, were Rocket Products' records in that office/lab?
>
> A. No. I don't recall any records in there at all, zero.

Q. Do you know what happened to the Rocket Products' records?
A. I don't know if there were any Rocket Products' records.

*Id.*, p. 199:4 – 24.

20. Soo Line's records reveal that Soo Line used chlorinated solvents at Shoreham Yard at least as early as 1974. Attached as Exhibit 12 to this Affidavit is a copy of page 2 of a document dated August 6, 1974 and entitled, "Soo Line Railroad Approved Cleaning Materials Mechanical Dept.," which Soo Line produced through discovery. This document is Bates labeled SLR011924. According to this document, Soo Line at the time had authorized the use, via saturated wiping cloth or forcible spray, of the following four cleaning materials on electrical rotating equipment within the Mechanical Department: Dowclene, Electro Chlor, Chlorathene NU and C&H Electrical Parts Cleaner. In the column entitled "Precautions and Procedures," the document also stated that users of the above products were to use "plenty of cleaner to insure dirt is carried out of equipment" because of the tendency of these cleaners to experience "quick evaporation."

21. Soo Line was engaged in discussions with the MPCA as early as 1977 about pollution problems at Shoreham Yard. Attached as Exhibit 13 to this Affidavit is a copy of a March 17, 1977 memorandum to file by D.M. Cavanaugh regarding "PCA Pollution Citation – Shoreham Terminal," which Soo Line produced through discovery. This document is Bates labeled SLR018628 – 29. The memorandum summarized a meeting on March 16, 1977 between various Soo Line employees in which they discussed an MPCA citation "for various pollution problems at the Shoreham terminal." According to this memorandum, a follow-up analysis by Soo Line revealed a number of areas evidencing "saturation" of one kind or another throughout

the "terminal." Those areas of saturation included the following areas, which are also areas of current study at the Shoreham Yard site:

> The next area of major saturation was the total area of the fueling stations on the east end of the yard. This included the fueling station used for servicing switch engines. The area is heavily saturated * * *.
>
> The other area of high saturation was north of the storehouse where empty barrels are being stored.

22. Soo Line engaged a consultant to conduct a soil investigation in 1977. Attached as Exhibit 14 to this Affidavit is a copy of a May 10, 1977 soil investigation report entitled "Report Of Soil Investigation -- Fuel Oil Contamination, North Minneapolis Yard," which was prepared by Soil Exploration Company for Soo Line and which Soo Line produced through discovery. This document is Bates labeled SLR18643 – 661. According to this report and the hand-written note by B.E. Pearson, the soil samples taken by Soil Exploration Company revealed heavy oil contamination in the sample taken within what Soo Line sometimes refers to as "Area F (Soo Line Pump House and Oil Storage)." *See* pp. SLR 018649 – 50, 60 – 61. The report also indicated some evidence of oil in a boring taken in the areas Soo Line sometimes refers to as "Area B (Soo Line Refueling/Collector Pan Area)" at a depth between 22' – 31' deep. *See* pp. SLR 018649, 54, 60 – 61.

23. In the summer of 1977, an MPCA representative suggested that Soo Line should install some means to collect spillage at the fueling station. Attached as Exhibit 15 to this Affidavit is a copy of a July 1, 1977 internal Soo Line memorandum, which Soo Line produced through discovery, that described a meeting with the MPCA representative. This document is Bates labeled SLR18608.

24. On or about March 13, 1978, Soo Line authorized the installation of a collector pan system for the stated reason that it was an MPCA requirement. Attached as Exhibit 16 to this Affidavit is a copy of a Soo Line document that reflected this authorization, which Soo Line produced through discovery. This document is Bates labeled SLR018719-20.

25. On or about January 15, 1979, Soo Line received approval from the MPCA of Soo Line's plans for a collector pan system. Attached as Exhibit 17 to this Affidavit is a copy of the MPCA's approval, which Soo Line produced through discovery. This document has been used in this litigation as Defendant's Deposition Exhibit 291 and is Bates labeled SLR018899 - 900.

26. Soo Line installed the collector pans in 1979, but there is no indication that Soo Line remediated the soils or groundwater that had already been contaminated, either at that time or at any time prior. Attached as Exhibit 18 to this Affidavit is a copy of a May 18, 1979 Soo Line request for proposals regarding the collector pan system installation, which Soo Line produced through discovery. This document has been used in this litigation as Defendant's Deposition Exhibit 292 and is Bates labeled SLR018857 - 58. Also attached as Exhibit 19 to this Affidavit is a copy of a June 26, 1979 Soo Line letter to the successful contractor, Hoglund Mechanical Contractors, Inc. ("Hoglund"), which Soo Line produced through discovery. This document has been used in this litigation as Defendant's Deposition 293 and is Bates labeled SLR018832 – 36. This letter provided additional details about the scope of the work and the terms of the contract between Soo Line and Hoglund.

27. On or about August 1, 1979, Soo Line and Ashland entered into a new lease that superseded the prior lease. The new lease again related to Ashland's use of the premises as a

"chemical blending plant and office." Attached as Exhibit 20 is a copy of this lease, which was attached to the complaint.

28. Soo Line entered into a stipulation agreement with the MPCA on or about December 7, 1979 to resolve a number of issues, including a number of fuel oil spills at Shoreham Yard. Attached as Exhibit 21 to this Affidavit is a copy of the stipulation, which Soo Line produced through discovery. This document has been used in this litigation as Defendant's Deposition Exhibit 89 and is Bates labeled SLR061963 - 72.

29. On or about December 18, 1979, Soo Line sent a letter to the MPCA advising it that Soo Line's collector pans were in operation. Attached as Exhibit 22 to this Affidavit is a copy of the Soo Line letter to the MPCA, which Soo Line produced through discovery. This document is Bates labeled SLR018775.

30. Ashland constructed new facilities in Shakopee, Minnesota for its Minneapolis operations. It received a certificate of occupancy toward the end of March, 1981, and began the move into the Shakopee facilities in the summer of 1981. Attached as Exhibit 23 is a copy of the Certificate of Occupancy for this facility, as issued by the City of Shakopee's Building Department. Ashland produced this document through discovery, which is identified as CASH04723. In a deposition taken on July 20-21, 2004 in this litigation, Stephen Cooke, a former Ashland District Manager, referred to the "completion of the Shakopee facility, which would have been sometime in the early summer of '81, I believe. Something in that general area." Copies of pages 1 – 3 and 102 from the transcript of Mr. Cooke's testimony are attached to this Affidavit as Exhibit 24. The above-referenced quote can be found at p. 102:18 - 20. Finally, a Hazardous Waste Storage Facility Permit issued to Ashland by the MPCA in 1990 corroborates the fact that Ashland began its Shakopee operations in early 1981. Attached as

Exhibit 25 to this Affidavit are excerpts from this 1990 permit, which was produced by Ashland through discovery. Specifically, Exhibit 25 consists of the cover to the permit, Bates labeled ASH-044-001-0019, and the first page of Part I ("Description of Facility"), Bates labeled ASH-044-001-0026. The MPCA acknowledged in Part I of the permit, "This plant site is owned and operated by Ashland Chemical Incorporated headquartered in Columbus, Ohio. Operations at the plant began in March 1981."

31. On or about May 10, 1982, the MPCA sent a letter to Soo Line asking Soo Line to look into certain concerns about several properties and, in many cases, prior tenants at the Soo Line properties. Attached as Exhibit 26 to this Affidavit is a copy of the May 10, 1982 MPCA letter that made this request, which Soo Line produced through discovery. This document is Bates labeled SLR065910 – 11. Pertinent excerpts include:

> As we discussed at our meeting on April 30, 1982 the Minnesota Pollution Control Agency (MPCA) has concerns about several properties which, I believe, are owned by the Soo Line. By this letter I am requesting you to gather certain information about these properties:
>
> 1. "South Fence - Shoreham Yard." The MPCA has received an anonymous complaint alleging disposal of drummed wastes by the Soo Line in the Soo Line's Shoreham Yard. * * *
>
> 2. "Rocket Products - Shoreham Yard." The MPCA has received an anonymous complaint alleging disposal of drummed wastes by Rocket Products in the Shoreham Yard. The disposal area was said to be west of Taco John's. * * *

32. On or about May 25, 1982, Soo Line personnel prepared a memorandum addressing the concerns raised by the MPCA. Attached as Exhibit 27 to this Affidavit is a copy of the memorandum, which Soo Line produced through discovery. This document is Bates labeled SLR065912 – 13. As to the complaint about Rocket Products, the authors wrote, in part: "Chemical blending activities May 1958 through June 1973 and then sold to Ashland Chemical

Company. The entire area between our yard tracks and Central Ave was inspected." As discussed *supra*, Ashland purchased certain Rocket Products assets through bankruptcy proceedings. Ashland did not purchase these assets through a direct sale from Rocket Products, as the above passage suggests. Furthermore, prior to the time of this inspection, Ashland had ceased its operations at Central Avenue and had moved its operations to Shakopee, as noted in paragraph 30, although records demonstrate that Ashland's lease was still in effect and the buildings and some tanks were still in place until removal later that year (see paragraphs 33 through 37). The memorandum found no reason to conclude that there had been disposal by Rocket Products, as the MPCA alleged. The memorandum made no mention of any concerns about disposal by Ashland.

33. Soo Line apparently arranged to inspect, with the MPCA's assistance, the lease area that had been occupied by Ashland and, before that, Rocket Products, in the summer of 1982. Attached as Exhibit 28 to this Affidavit is a copy of an August 19, 1982 letter, which Soo Line produced through discovery. This document is Bates labeled SLR016380 – 81. The letter itself is between Soo Line and a party who was interested in taking over the Central Avenue site that had been vacated by Ashland. The internal handwritten note reports: "I inspected the site with PCA representative and we found no reason for concern as to pollution. I have no objections."

34. In a letter dated September 7, 1982, Ashland wrote to Soo Line giving notice of the termination of its lease, to be effective September 30, 1982. Attached as Exhibit 29 to this Affidavit is a copy of the notice, which Soo Line produced through discovery. This document is Bates labeled SLR016370.

35. In a letter dated September 13, 1982, Soo Line responded by letter to Ashland's notice of termination. Attached as Exhibit 30 to this Affidavit is a copy of the letter, which Soo Line produced through discovery. This document is Bates labeled SLR016372. Soo Line stated to Ashland: "Upon termination we require that the property promptly be cleared and restored to a satisfactory condition. This would include removal of all buildings, improvements and facilities including foundations and leveling the property." In a typed internal message on a blind carbon copy, Soo Line instructed one of its employees: "Please advise shortly after Oct. 1, 1982 if the premises have been cleared and restored to a satisfactory condition. The deal with Kent Swanson of Swanson Machinery Company did not materialize." Also attached as Exhibit 31 to this Affidavit is another copy of this same document, which Soo Line produced through discovery. This document is Bates labeled SLR016376. On this version a handwritten note appears stating as follows: "Pls review this site to be sure no signs of Hazardous chemicals or spills will be left in area." (emphasis in original)

36. In a typed memorandum dated October 8, 1982, a Soo Line employee reported: "Referring to your correspondence of September 13, 1982 regarding property formerly leased by Ashland Chemical Co. The property has been vacated, cleared, and leveled to a satisfactory condition except for a telephone utility box which I assume is owned by Northwestern Bell." Attached as Exhibit 32 to this Affidavit is a copy of this memorandum, which Soo Line produced through discovery. This document is Bates labeled SLR016373.

37. On that same date, a Soo Line employee hand-wrote a memorandum that also reported that the inspection of Ashland's portion of the former lease area revealed no concerns of any kind. The memorandum stated, "Per the attached, area of the Ashland Chemical Company lease was inspected and found to be in satisfactory condition. Area has been cleared and grade

[sic] and there is no signs of any hazardous materials or spills." Attached as Exhibit 33 to this Affidavit is a copy of this memorandum, which Soo Line produced through discovery. This document is Bates labeled SLR016374.

38. In a letter dated October 19, 1982, Ashland confirmed the termination of the lease with Soo Line, as of September 30, 1982. Attached as Exhibit 34 to this Affidavit is a copy of the letter, which Soo Line produced through discovery. This document is Bates labeled SLR016369.

39. In 1986, testing at Shoreham Yard revealed releases and discharges of chlorinated solvents from Soo Line operations. Attached as Exhibit 35 to this Affidavit is a copy of a series of chemical analysis reports done by Twin City Testing ("TCT") for the Metropolitan Waste Control Commission ("MWCC"), which Soo Line produced through discovery. In particular, these reports detail the results of testing done by TCT of water samples collected at Shoreham Yard. The first page of this document, Bates labeled SLR020524, is a one-page report, dated March 14, 1986 that reports results of 290 parts per billion of 1,1,1-Trichloroethane ("1,1,1-TCA") in the water sample TCT received for testing on March 11, 1986. The second and third pages of this document, Bates labeled SLR020525 – 26, constitute a report dated April 14, 1986 that indicates 1,1,1-TCA in three samples at levels of 1,000, 280 and 77 parts per million.

40. Additional results also obtained in 1986 showed further releases specifically involving chlorinated solvents. Attached as Exhibit 36 to this Affidavit are excerpts from a June 12, 1986 MWCC report of its March 3-21, 1986 monitoring results at Shoreham Yard, which Soo Line produced through discovery. Specifically, Exhibit 36 consists of the report's cover page (Bates labeled SLR020514) and the final page of the report (SLR020532). The final page of the report, entitled "Industrial Waste Monitoring Results, Soo Line Railroad Company,

March 3 – 21, 1986, Conclusions/Observations," contains the following observation by the MWCC: "The Soo Line Railroad Company uses solvents to aid the cleaning of large diesel train engines and some of these solvents reach the sanitary sewer. Grab samples were taken of the sewer discharge which includes grabs of an oil build up behind the weir at the Transfer Table Monitoring Site. 1,1,1-Trichlorethane was found in minor concentrations in water phase of this industrial discharge but was in significant amounts in this firms oil discharge concentrations up to 1000 mg/l."

41. Soo Line commissioned Dames & Moore to perform a site contamination study sometime in 1987. Attached as Exhibit 37 to this Affidavit are excerpts from a July 31, 1987 Dames & Moore "Report of Findings" regarding its survey and sampling of rail yard areas at Shoreham Yard, which Soo Line produced through discovery. In particular, Exhibit 37 includes the cover to the Report (Bates labeled SLR005598), the Table of Contents (SLR005600) and the body of the Report (SLR005601-17). Attached as Exhibit 38 is an internal Soo Line memorandum discussing the Report's implications (SLR005599). The internal memorandum addresses potential remedial action, stating, in part:

> The two major areas of concern are 1) the diesel fuel tanks/refueling area and 2) the old dump areas north of the Freight House.
>
> The tank and fueling area has high fuel contamination in the soil all the way down to the clay layer, 25 to 27 feet below the surface, Depending on the lateral extent of the contamination, the total volume of contaminated soil could be quite large. If remedial action was required, one plan might be to excavate and run the contaminated soil through a mobile incinerator to burn off the contaminates. The "clean" soil could then be used for backfilling. This would undoubtedly be quite costly.

42. On or about August 17, 1988, Soo Line provided notice to the MPCA of various spills, including a 3,500 gallon fuel spill at the Shoreham fueling area. Attached as Exhibit 39 to

this Affidavit is a copy of the notice, which Soo Line produced through discovery. This document has been used in this litigation as Defendant's Deposition Exhibit 97 and is Bates labeled SLR000842 – 43.

43. The MPCA responded to the notice of the 3,500 gallon spill in a letter dated August 24, 1988. Attached as Exhibit 40 to this Affidavit is a copy of the response, which Soo Line produced through discovery. This document has been used in this litigation as Defendant's Deposition Exhibit 90 and is Bates labeled SLR000857 – 58.

44. The MPCA requested that Soo Line conduct a subsurface investigation for the "collector pan area" during a site visit in 1988, according to a 1991 report prepared by one of Soo Line's consultants. Attached as Exhibit 41 to this Affidavit are excerpts from the May 28, 1991 report by Delta Environmental Consultants, Inc. ("Delta"), which was obtained from the MPCA and is entitled "Progress Report/Work Plan, Soo Line Shoreham Yard." Specifically, Exhibit 41 includes the cover to the report (Bates labeled MPCA000472), the Table of Contents (MPCA000473 – 74) and pages 1 - 4 (MPCA000475 – 78). Soo Line produced this report through discovery. Section 2.3 ("Areas of Concern") on page 3 of this Report includes the reference to the MPCA's 1988 request.

45. As early as 1990, Soo Line characterized its investigation as remedial in nature. On or about March 21, 1989, Soo Line submitted to the MPCA a Soil and Groundwater Remedial Investigation Report, prepared by a consultant named Wenck. At that time, the focus of the investigation was on the spill area and the collector pan area. Attached as Exhibit 42 to this Affidavit are excerpts from the report, which was obtained from MPCA records. Specifically, Exhibit 42 consists of the title page (Bates labeled MPCA000206), the Table of

Contents (MPCA000207), Section I ("Introduction") (pp. 1-3, MPCA000209 – 211) and Section VI ("Summary") (pp. 22-24, MPCA000230 – 32).

46. Also in about March 1989, the Minnesota Department of Health ("MDH") advised Soo Line that sampling results from a Soo Line well revealed chlorinated solvent contamination. Attached as Exhibit 44 to this Affidavit is a copy of a two-page March 2, 1989 MDH laboratory report on volatile hydrocarbons, Bates labeled SLR021089-90, which Soo Line produced through discovery. According to hand-written notations on this document, the report involved testing of the "Soo Line Shops Well." The laboratory report indicates that the sample met or exceeded reporting limits for a number of different compounds, including 1,1,1-TCA, 1,1,2-Trichloroethene and c-1,2 Dichloroethene. Finally, a hand-written note under the "Comments" section on the first page states, "Perk Present (Below Quantification Limit)."

47. On May 5, 1989, Delta submitted the "Proposed Additional Remedial Investigation Work Plan" to the MPCA. Attached as Exhibit 43 to this Affidavit is a copy of the report, which was obtained from MPCA records. This document is Bates labeled MPCA000457 – 70. This investigation pertained to the fuel oil contamination, not the deep well contamination.

48. In December, 1989, the MDH again reported chlorinated solvent contamination to the Soo Line well. Attached as Exhibit 44 to this Affidavit is a copy of a December 15, 1989 report from the MDH to Soo Line regarding the results of water sample analyses of the Shoreham shops well, which Soo Line produced through discovery. This document is Bates labeled SLR021079-81. The MDH detected two groups of Volatile Organic Chemicals (VOCs) in the water samples from the well. The second group of VOCs included solvents and degreasers (specifically, chlorinated solvents) such as 1,1-dichloroethane, c-1,2-dichloroethene, 1,1,1-TCA and 1,1,2-TCA. According to the report, "These chemicals are typically used as solvents and

degreasers. They are not naturally occurring in Minnesota's groundwater." Although the report indicates that detected VOCs are below the MDH's maximum contaminant or recommended allowable limits, the report recommends that Soo Line should provide closer management of its use of chlorinated materials and that Soo Line should "attempt to locate the solvent source(s)" and continue to monitor the well, among other courses of action.

49. A document from December 1989 reveals that Soo Line was still purchasing and using chlorinated solvents as of that time period. Attached as Exhibit 45 to this Affidavit is a copy of a two-page internal December 21, 1989 Soo Line memorandum, without attachments, Bates labeled SLR053974 – 75, which Soo Line produced through discovery. The memorandum recommended that Soo Line's Mechanical Services division reduce its use of chlorinated hydrocarbon cleaners wherever possible because of concern about the "serious consequences" that could result from the "misuse or improper handling" of such cleaners. The memorandum also indicated that Soo Line ordered 2,200 gallons of either "Dowclene EC" or "Chemcentral M - 220" for the "Shoreham Shops" during the period from October 29, 1988 – October 29. 1989. Both products, according to the memorandum, contained 1,1,1,-trichloroethylene and perchloroethylene. The memorandum also indicated that Soo Line ordered "Cherokee Cold Tank Cleaner," a product that contained methylene chloride and monochlorobenzene, for the Shoreham shops during that same time period.

50. In May 1991, the MDH advised Soo Line to discontinue use of its well water for human consumption because of the presence of chlorinated solvents in the water. Attached as Exhibit 46 to this Affidavit is a copy of the report from the MDH to Soo Line, produced on or about May 1, 1991 regarding water samples the MDH collected from Soo Line's "public water

supply" at Shoreham Yard on January 30 and March 1, 1991. Soo Line produced this document, which is Bates labeled SLR004577 – 84, through discovery. The cover letter stated:

> Attached are the analytical results of the water samples collected from your public water supply on January 30, and March 1, 1991. The samples were analyzed for volatile organic chemicals (VOC's) and coliform bacteria. The chemical trichloroethene, was detected in the water above the maximum contaminant level (MCL) for this contaminant. The average trichloroethene level was found to be 5.2 micrograms per liter. Water from your water supply must not be made available for human consumption. Drinking water contaminated with trichloroethene may increase the risk of cancer in humans who are exposed above the MCL over a long period of time.

51. On May 21, 1991, Soo Line confirmed to the MDH that it had closed the water supply well due to the chlorinated solvent contamination. Attached as Exhibit 47 to this Affidavit is a copy of the communication from Soo Line to the MDH, which Soo Line produced through discovery. This document is Bates labeled SLR021063.

52. In 1991, Soo Line submitted a status report and work plan that described the work at Shoreham Yard as a remedial investigation and addressed long-term corrective actions. Excerpts from this May 28, 1991 report by Delta are attached to this Affidavit *supra* as Exhibit 41. The report reiterated the remedial nature of the investigation in Section 1.1 ("Purpose"):

> This report summarizes all the remedial investigation work completed at the Soo Line Railroad Company's (Soo Line) Shoreham Yard in Minneapolis, Minnesota, and proposes additional investigative work for the site. *The goal of the additional work is to continue to gather the necessary information to develop an appropriate long-term corrective action design for the site and determine if contamination has migrated off site.* (emphasis added)

Section 2.3 ("Areas of Concern") of the document explained the reason for the investigation:

> The MPCA requested a subsurface investigation be completed for this area during a site visit in August 1988. The subsequent investigation

> completed by Wenck Associates (Wenck), combined with the earlier investigation completed by Soil Exploration Company (SEC) in 1977, identified fuel oil related contamination in both the soil and ground water underlying this area.

This report, however, made no mention of the finding of VOCs (specifically, chlorinated solvents) in the public water supply that had been reported by the MDH or that Soo Line had shut-down its well in response, nor did the report describe any investigation into that contamination.

53. On or about July 1, 1992, Soo Line submitted to the MPCA the "Phase II Remedial Investigation Report," which was also prepared for Soo Line by Delta. Attached as Exhibit 48 to this Affidavit is this report, dated June 25, 1992, which was obtained from the MPCA, and Bates labeled MPCA000805 – 1042. Among other things, that document reported, in Section 2.3 ("Areas of Concern"):

> In summary, three previously investigated areas (former tank basin, collector pan areas, and the pumphouse) and one newly discovered area (lease area) of soil and ground water contamination have been identified within the study area (Figure 3).

Exhibit 48, p. 2 (MPCA000809). Section 2.3 concluded with the following observation regarding the former lease area:

> The final area of concern is located along Central Avenue between 29th Avenue and 30th Avenue. This area is shown in Figures 3 and 4 and is referred to as the lease area. This area was leased by Soo Line to several companies from May 1913 to August 1979. Operations on the leased property have included a coal and wood fuel yard, a fuel oil facility, a lumber yard, and a chemical blending plant. A gasoline service station may have also been located on a portion this property. Since the property was vacated, the buildings, above ground storage tanks, and other structures have been removed and the area landscaped.

*Id.*, p. 3 (MPCA000810). Other excerpts pertaining to the lease area stated:

> [Groundwater] "All 19 wells did contain detectable levels of either THC as fuel oil, THC as gas, or unidentified volatile organic compounds (Table

> 6). * * * *Fuel oil, gasoline, toluene, ethylbenzene, and xylenes were identified within the lease area and the collector pan area*. Also, the laboratory identified peaks of lower and higher boiling point organic compounds not typical of fuel oil for all 15 samples (Table 6 and Appendix D)." [Section 3.6 ("Ground Water Contamination") (emphasis added)] *Id.*, p. 12 – 13 (MPCA000819 – 20).
>
> [Extent of Soil Contamination]: "*Shallow soil contamination exists within . . . the lease area*. *** The soil contamination detected in the soil sample was identified as gasoline and had the highest concentrations of BTEX compared to any other soil sample collected to date. *The shallow depth of contamination and the high concentrations of volatile organic compounds strongly indicate that the source of contamination was from the former tanks located on the leased property*." [Section 4.1 ("Extent of Soil Contamination") (emphases added)] *Id.*, p. 13 – 14 (MPCA000820 – 21).
>
> [Extent of Ground Water Contamination]: "[*T*]*he higher boiling point compounds detected in the lease area are believed to be contributing to the off-site contamination* found in MW-317." [Section 4.2 ("Extent of Ground Water Contamination") (emphasis added)] *Id.*, p. 15 (MPCA000822).

Finally, Figures 12, 14 and 17 to the 1992 Report, which can be found at Bates labeled pages MPCA000847, MPCA000849 and MPCA000852, illustrate soil contamination at shallow, medium and deep levels, respectively, within and around the footprint of the lease area.

54. In about July 1992, Soo Line engaged a contractor to seal the Shoreham shops area well that it had shut down in 1991. Attached as Exhibit 49 to this Affidavit is a copy of correspondence relating to this work, dated July 17, 1992, and Bates labeled SLR021059 – 62.

55. In October 1992, Soo Line advanced three soil borings during a follow-up investigation of the Lease Area. VOCs were detected at a depth of 22 feet in one boring and at a depth of 3 to 14 feet in another, but not in the third. Soo Line provided its report concerning these borings, which was prepared by Delta, in a document entitled "Remedial Investigation Report Addendum," dated July 22, 1993. Attached as Exhibit 50 to this Affidavit are excerpts from this Report Addendum. Specifically, Exhibit 50 consists of the Report Addendum's cover

(Bates labeled PR002412-13), the Table of Contents (PR002414), and page 4, which includes the above-cited results (PR002418).

56. Soo Line documents confirm that on or about June 23, 1994, Soo Line was still using up stocks of Dowclene, a chlorinated cleaning solvent that had been in use in and around the Shoreham shops areas for at least 20 years. *See* Paragraph 20, *supra*. Attached as Exhibit 51 to this Affidavit is a copy of a June 23, 1994 Soo Line memorandum entitled "The Elimination of DOWCLENE Cleaner on HHUS." This document was produced by Soo Line through discovery and is Bates labeled SLR010106. The memorandum reported that purchases had been discontinued in December of 1992 but that "Current stocks of Dowclene can be used up."

57. On or about June 30, 1994, Soo Line submitted an MPCA Voluntary Investigation and Cleanup ("VIC") Program application to the MPCA requesting that it be allowed to undertake a voluntary investigation of the areas of concern, referred to as the "Shoreham Shops & Shoreham Lease Area," within the VIC program. Attached as Exhibit 52 to this Affidavit is a copy of the application and cover letter, which were provided by the MPCA and are Bates labeled MPCA001140 – 46.

58. On or about September 27, 1994, Soo Line submitted an "Interim Response Action Plan," prepared by Delta, to the MPCA for the Soo Line Railroad Shoreham Yard Site. Attached as Exhibit 53 to this Affidavit are excerpts from this plan, which was provided by the MPCA. Specifically, Exhibit 53 consists of the Plan's cover (MPCA001148), the Table of Contents (MPCA001149), and pages 1 and 4 (MPCA001150, 53). Delta, in Section 3.1 of this Plan ("Free Product Recovery Response Action – Overview"), viewed the clean-up goal of "recovery of free-phase product on top of the ground water table in the collector pan and pumphouse areas" as "a realistic remediation option."

59. The EPA and the MPCA delineated the respective roles and responsibilities as between themselves with respect to contaminated sites, in a document entitled "Superfund Memorandum of Agreement," dated December 2, 1994 attached as Exhibit 54. In an addendum dated May 3, 1995, attached as Exhibit 55, the MPCA and the EPA agreed to promote appropriate investigations and cleanups by parties participating in the VIC program to facilitate "Brownfield" revitalization.

60. Soo Line eventually started the recovery operations in the "collector pan area" on or about June 7, 1995. Attached as Exhibit 56 to this Affidavit is a copy of a July 7, 1995 letter from Delta to the MPCA, which the MPCA provided and which is Bates labeled MPCA001290. In the letter, Delta notified the MPCA that Soo Line, through Delta, began "ground water pump out and product recovery" efforts on June 7, 1995. Soo Line continued the pumping program until December 28, 1999. Attached as Exhibit 57 to this Affidavit is a copy of a "Special Discharge Report," dated January 4, 2000, which was submitted to the Metropolitan Council Environmental Services on Soo Line's behalf regarding this work. This document was produced by Soo Line through discovery and is Bates labeled SLR004887 – 88.

61. On or about September 20, 1995, MPCA sent a letter to Soo Line requesting that Soo Line submit a work plan for the non-petroleum release reported at the former lease area. Attached as Exhibit 58 to this Affidavit is a copy of that letter, which was provided by the MPCA and is Bates labeled MPCA012323 – 25.

62. On or about November 14, 1995, Soo Line advised the MPCA via email that it had a new project manager and that it would be using a new consultant, Braun Intertec (Rick Johnston) for the chlorinated solvent issue, while keeping Delta for the petroleum investigation. Soo Line also reported that it was on track to meet a deadline of December 20, 1995 for

submitting the work plan for investigating the chlorinated solvent plume. Attached as Exhibit 59 to this Affidavit is a copy of an internal MPCA email summarizing the information from Soo Line, which was provided by the MPCA and is Bates labeled MPCA016298.

63. In February 1996, Soo Line submitted a "Phase II Investigation Work Plan," for the Shoreham Yard Lease Area, Collector Pan Area and Waste Reclamation Area, which had been created for Soo Line by Braun Intertec ("Braun"). Attached as Exhibit 60 to this Affidavit are excerpts from this Plan, which was provided by the MPCA. Specifically, Exhibit 60 includes the cover to the Plan (Bates labeled MPCA001647), the Table of Contents (MPCA001649 – 51), page 1 (MPCA001652), Section 2.6: Areas of Concern, pages 10-11 (MPCA001661-62) and pages 12 – 16 (MPCA001663 – 67). Among other things, the introduction address the fact that the petroleum releases from the collector pan area commingled with other sources of contamination in the lease area. Specifically, the document stated:

> *It is not possible to evaluate the VOC problem to the exclusion of the ongoing petroleum remediation or other potential sources of contamination on the property because the contaminants are co-mingled, particularly in the lease area, but the known petroleum releases and other areas of the site are not the primary focus off this investigation.*

Exhibit 60, p. 1 (emphasis added). In addition, the Plan presented a "Presumptive Remedy Analysis" in Section 3.0 and explained why interim response actions did not seem to be warranted. In pertinent part, Section 3.1 ("Introduction") of the document stated:

> *The objective of performing a presumptive remedy analysis is to use past experience gained through the U.S. Environmental Protection Agency's (EPA's) Superfund program to streamline a site investigation and speed up selection of appropriate remedial actions. * * * In particular, a presumptive analysis can be used to focus data collection efforts during a remedial investigation.*
>
> ***

> Based upon the presence of VOC contamination and the geologic/hydrogeologic setting of the lease area, several presumptive remedies were identified for consideration. They include the following: capping, soil vapor extraction, hydraulic containment/treatment.

*Id.*, p. 12 (emphases added). Thus, this document emphasized the fact that Soo Line was then engaged in a remedial investigation. In Section 3.4.3 ("Ex-situ Remedies"), Soo Line explained why it was not pursuing excavation:

> *Excavation is impractical due to the apparent depth to which contaminants have migrated in the unsaturated zone (approximately 40 to 45 feet) and other constraints imposed by the location of the site (i.e. site is adjacent to a roadway and active rail line*).

*Id.*, p.14 (emphasis added). Finally, Section 3.6 ("Interim Response Action") set forth the reasons why no interim action was planned for the groundwater at that time.

> The current free product recovery system has not been operating long enough to understand the effectiveness of either its intended purpose of collecting free product or additional effect of capturing dissolved, non petroleum-related contaminants. Continued operation of RW-2 provides some benefit but it will likely complicate the investigation of the lease area. *No other interim action with respect to the groundwater is recommended. At this time we do not believe it is appropriate to initiate interim response action in the unsaturated zone.*

*Id.*, p. 15 (emphasis added).

64. In a document dated April 30, 1997, Soo Line documented a conceptual plan for the redevelopment of the former shops property at Shoreham Yard in Minneapolis. Attached as Exhibit 61 to this Affidavit is a copy of this plan, which Soo Line produced through discovery. The document is Bates labeled SLR061291 – 95. This document described the environmental situation for the entire property, stating:

> ENVIRONMENTAL: The entire property has either known or suspected contamination. The easterly most portion of the property along Central Avenue, and in the area of the former fueling station has been tested and is in the process of remediation. This property is identified as the "Central

> Avenue Property" on the attached Plan I. This property can be marketed and the remediation dealt with simultaneously.
>
> While no actual testing has occurred on the balance of the vacated shops property, because of its past use it is suspected to contain substantial contamination. This property includes the buildings and the areas around the buildings ("Shops Buildings" on Plan I), and the South Yard and the yard area southwesterly of the shops buildings ("South Yard" on Plan 1) Rather than attempting to deal with the potential contamination on that property at this time, it is proposed that this property be kept in railroad ownership and use by renovating and renting some of the buildings, razing the buildings which cannot be retrofitted, clearing the South Yard, and redeveloping the surface of the South Yard for transload sites.

This document reflected a plan to divide the property into a portion that would be remediated and sold for redevelopment by private developers and another portion to be retained for redevelopment by Soo Line in order to avoid "attempting to deal with the potential contamination on that property at this time." Exhibit 61 Bates labeled SLR061292.

65. On or about November 26, 1997, Soo Line submitted to the MPCA its "Phase II Investigation Report, Shoreham Yard Lease Area and Waste Reclamation Area" prepared by Braun. Attached as Exhibit 62 to this Affidavit are excerpts from this Report, which was provided by the MPCA. Specifically, Exhibit 62 includes the body of the Report (Bates labeled MPCA002565-2608). This 39-page report described the work that had been done in the investigation based upon the 1996 work plan and recommended additional investigation work.

66. A meeting was held between the MPCA project staff and CP Railway on April 13, 1998 to discuss conceptual plans for a proposed development at the Site, Site administrative issues, and a schedule for completing the Site investigation and the response action plan for the Site. Attached as Exhibit 63 to this Affidavit is a copy of a May 1, 1998 MPCA letter to Soo Line that included a summary of this meeting. This document, which was obtained from the MPCA, is Bates labeled MPCA002518 – 20. The letter recounted the following:

> On April 13, 1998, a meeting was held between the MPCA project staff and CP Railway to discuss conceptual plans for a proposed development at the Site, Site administrative issues, and a schedule for completing the Site investigation and the response action plan for the Site. During this meeting, CP Railway indicated that the Site property currently defined as MPCA Project Number 5080 will need to be partitioned in order to allow the property that is proposed for redevelopment to pursue a Certificate of Completion on an accelerated schedule. The property proposed for redevelopment includes the Lease Area, the Waste Reclamation Area, the Collector Pan Area, and a portion of the Site east of a railroad spur that includes the roundhouse facility. The MPCA staff understands that CP Rail intends to submit a separate VIC Application for Technical Assistance for this part of the Site in the near future. Please note that this letter addresses only the portion of the Site addressed in the Report and does not address additional investigation and potential response actions for contamination identified on other portions of the Site - including the Collector Pan Area, the Pumphouse Area, and the Former Tank Basin Area.

67. Shortly after this meeting and this letter, Soo Line sent to Ashland correspondence notifying Ashland of its claims and including a notice of "imminent" danger, ostensibly to satisfy a notice requirement for an action under RCRA. Attached as Exhibit 64 to this Affidavit is a copy of a May 4, 1998 letter to Ashland, Bates labeled SLR000523 – 25. A copy of a June 2, 1998 letter to Ashland and Murphy is attached as Exhibit 65.

68. About a year after the April 1998 meeting and the letters from May and June 1998, Soo Line asked its consultant to prepare a new "Phase I site screening investigation" report. Attached as Exhibit 66 to this Affidavit is a copy of a Soo Line letter, dated May 12, 1999, and Bates labeled MPCA004505 – 06. This letter stated:

> Soo Line Railroad Company doing business as Canadian Pacific Railway (CPR) requests that Braun Intertec Corporation (Braun) prepare a Phase I site screening investigation for the eastern portion of CPR's Shoreham Yard Property (the Property). This real estate includes parcels of land that have been leased to tenants, as well as land occupied continuously by CPR.
>
> The area of interest (the Site) includes land and appurtenances that lie north of 28th Avenue and south of 31st Avenue and is outside: 1) the

> fenced control area occupied by the Intermodal Facility, 2) buildings adjacent to that fence, and 3) the former shops buildings. At its widest point, the area of interest reaches approximately 900 feet west of Central Avenue (the western margin of Soo Line's former Tank Basin Area). Parcels included in the area of interest are the Eastern Leased Properties areas along Central Avenue, the Collector Pan Area, the Pumphouse and Oil Storage Area, the Former Tank Basin Area, the Roundhouse Area, the Former waste storage/Storehouse Area, and the land area connecting them.
>
> Braun has previously prepared Phase I reports for many of the parcels that make up the Site, but the age of those documents exceeds the recommended eighteen month life for supporting property transactions. Moreover, CPR desires to have a single, consistently developed document that describes the history of use and identifies existing or suspected environmental conditions that pertain to the entire Site.
>
> * * *
>
> When completing the requested Phase I, CPR requests that Braun fully and completely address the contents recommended by ASTM E 1527 and the Minnesota Pollution Control Agency's Voluntary Investigation and Cleanup Program Guidance Document #8 - Phase I Investigation, inclusively."

ASTM E 1527 is a 27-page document created by the American Society for Testing and Materials (ASTM) International and entitled, "Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process." Attached as Exhibit 67 to this Affidavit is a copy of the first page of ASTM E 1527. Section 1.1 of ASTM E 1527 ("Scope") describes the purpose and intent behind this guidance document:

> The purpose of this practice, as well as Practice E 1528, is to define good commercial and customary practice in the United States of America for conducting an *environmental site assessment*[2] of a parcel of *commercial real estate* with respect to the range of contaminants within the scope of Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and *petroleum products*. As such, this practice is intended to permit a *user* to satisfy one of the requirements to qualify for the *innocent landowner defense* to CERCLA liability: that is, the practices that constitute "all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice" as defined in 42 USC § 9601(35)(B). (See Appendix X1 for an outline of

> CERCLA's liability and defense provisions.) An evaluation of *business environmental risk* associated with a parcel of commercial real estate may necessitate investigation beyond that identified in this practice (see Sections 1.3 and 12). (italicized words and terms in original)

69. On or about August 2, 1999, Soo Line sent the Phase I Site Assessment to the MPCA, with the cover letter indicating that the report was submitted in response to an MPCA request. Attached as Exhibit 68 to this Affidavit are excerpts from the Site Assessment, which was produced by the MPCA. Specifically, Exhibit 68 includes the cover transmittal letter (Bates labeled MPCA004767), the cover to the Site Assessment (MPCA004768), the Table of Contents (MPCA004770 – 73), pages 1 – 2 (MPCA004774 – 75) and Figure 3 (MPCA004793). This document described the site under investigation and divided the site into six areas, as follows:

> The Site for the 1999 Phase I ESA was approximately 24 acres in size. The Site, for the purposes of the 1999 Phase I ESA, was divided into the following six areas:
>
> - Area A - the former lease area.
> - Area B - the collector pan area.
> - Area C - the round house, the diesel house, the paint storage building, mad associated railroad track areas.
> - Area D - the former icing station buildings area.
> - Area E - the former waste reclamation building, and the former storehouse building with associated former exterior storage areas.
> - Area F - the pump house and oil storage area.

Figure 3 in the Report provided a graphic illustration of the six areas described above.

70. Not long thereafter, on or about October 11, 1999, Soo Line submitted to the MPCA a "Remedial Investigation and Supplemental Phase II Investigation Work Plan." Attached as Exhibit 69 to this Affidavit are excerpts from the Remedial Investigation Work Plan. Soo Line produced a copy of the cover letter to the Plan through discovery; the Plan itself was produced by the MPCA. Exhibit 69 consists of the following: cover letter (Bates labeled

SLR000187), the cover to the Plan (MPCA005434), the Table of Contents (MPCA005435 – 36) and pages 1 and 5 (MPCA005437, 41). Section 1.0 of this Report ("Introduction") described the expanded area of investigation:

> Subsequent to completion of Braun Intertec, 1997, CPR has expanded the area to be further evaluated to include not only the lease and waste reclamation areas, but also the collector pan, pump house, and round house areas of the Shoreham Yard. The portion of the Property to be investigated, hereafter known as the Site, is shown on Figure 2.

Exhibit 69, p. 1. This document employed the six separate areas of the "Site" that had been used in the Phase I Site Assessment. This document explained, in Section 3.0 ("Scope of Work"), how the investigation related to the eventual remediation plan:

> The soil borings and monitoring wells described below will provide a better understanding of the source, nature, extent and magnitude of the known soil impacts on the Site. This additional information will be used in the upcoming Risk Assessment to determine the volume of soil and the degree to which groundwater needs to be remediated to protect human health and the environment. In addition, the data will provide sufficient information to prepare a formal Feasibility Study and narrow the list of potential remedial alternatives.

*Id.*, p. 5.

71. Sometime thereafter, Soo Line elected to change its consultants, but a massive report submitted as of May 31, 2001 plainly continued the remedial investigation work that had been promised in 1999. At that time, Soo Line submitted a seven volume document entitled "Phase II Supplemental Remedial Investigation Report, Shoreham Facility." Attached as Exhibit 70 to this Affidavit are excerpts from the Remedial Investigation Report, which was obtained from the MPCA. Specifically, Exhibit 70 includes the cover letter to the Report (Bates labeled MPCA005852); the cover page to Volume I (MPCA005853); the Table of Contents, List of Volumes, List of Tables, List of Figures, and List of Appendices (MPCA005855 – 65); pages 1-1– 1-2, Sections 4.2.4 and 4.2.5.4 (MPCA005868 - 69, MPCA005919 –36, MPCA005946 –

48); and Figure 1 – 2 (MPCA006344). The first volume provided a narrative report, followed by six additional volumes of figures, tables, and appendices. Section 1.0 of Volume I ("Introduction") explained the background and authorship for this report:

> The Site encompasses an area which contained a number of railroad and non-railroad operations, including an area leased to former tenants (the former Lease Area), a collector pan/refueling area, the Shoreham Facility round house, an ice storage area, a waste reclamation area, and a pumphouse area (Figure 1-2).
>
> ***
>
> Subsequent to completion of the 1997 Phase II Investigation Report, CPR confirmed that additional investigation was required to identify potential VOC sources, as well as to refine the understanding of Site geology and hydrogeology. At that time, CPR also expanded the area of investigation to include, not only the former lease and waste reclamation areas, but also the Collector Pan, Pumphouse, and Round House Areas of the Shoreham Facility. A Remedial Investigation and Supplemental Phase II Investigation Work Plan (Braun, 1999; hereafter, the 1999 Work Plan) was then prepared. Field work described in the 1999 Work Plan was implemented by Braun between January 2000 and September 2000.
>
> IT Corporation was contracted by CPR to provide oversight of all field work performed by Braun during execution of the 1999 Work Plan. Following completion of' the field investigation, IT was contracted by CPR to produce this Phase II Supplemental Remedial Investigation Report.

Exhibit 70, pp. 1-1 – 1-2. The figure referenced above, Figure 1-2, is included as part of Exhibit 70. Section 1.2 of Volume I ("Purpose of the Investigation") explained the purpose of the investigative efforts as follows:

> The scope of work performed in the Year 2000 Investigation supplements previous investigations by quantifying in detail the geology, hydrogeology and environmental impacts to soil and groundwater at the Site. Specifically, the goal of the Year 2000 Investigation was to further quantify, and in some instances confirm, the vertical and lateral extent of soil and groundwater impacts associated with source areas identified during previous investigations. The work was also conducted to assess the extent of dispersion of groundwater impacts from the suspected source

> areas both laterally and vertically and to identify groundwater impacts of petroleum and non-petroleum compounds in dissolved and/or free-phase forms. Data obtained from the investigation is expected to be used in preparing a risk evaluation and a formal feasibility study.

72. The 110-page report (Exhibit 70) included in Volume I provides a summary of remedial investigation results to that point. The report employed the Areas A through F that had been defined by Braun. The report analyzed sources, soil contamination and groundwater contamination by discussing various groups of contaminants of concern.

One point that is addressed in this report is floating "free product" in the former lease and collector pan areas.

> Free petroleum product accumulation in the form of LNAPL, floating on the water table, was mapped in the Ashland Lease Area, Collector Pan Area, and in the Pumphouse Area (Figure 4-20). Free product in the Ashland Lease and Collector Pan Areas is composed of solvents mixed with petroleum related compounds.

Exhibit 70, § 4.2.5.4. This point is consistent with the explanation in Exhibit 60 (a 1996 Braun report) that the petroleum releases from the collector pan area commingled with other sources of contamination in the lease area. See paragraph 63, *infra.*

The 2001 IT report also refers to data showing soil contamination from styrene, among other things.

> The area over which xylene and styrene are distributed has a width of nearly 100 feet. This large area of distribution *suggests a large source*. The sample locations labeled SB00-13, SB00-14, SB00-15 and SB00-16 encompass an area where Ashland operated a chemical warehouse and blending facility. More than 13 ASTS (capacities from 25,000 to 14,000 gallons) were located in this area. *The unusually high concentrations of xylene and styrene suggest a concentrated source material, rather than a source with xylene and styrene as minor components.* The tanks *operated in the Ashland Lease Area were known to contain styrene and xylene in their pure forms*. Additional smaller tanks were also present at various times and their contents were unknown. (emphases added).

*Id.*, pp. 4-26 (emphases added). It should be noted that styrene is a listed hazardous substance under CERCLA. 40 CFR 302.4. Finally, the report also recommended additional investigation for the site and also recommended that the risk evaluation be deferred pending further study.

73. Some explanation is warranted regarding the above-quoted statements concerning styrene and Ashland/Rocket Products. Rocket Products occupied the same location for its respective operations with the chemical warehouse and blending facility that Ashland later occupied. Soo Line and its consultants have assumed that Ashland is a successor to Rocket Products, and thus use the term "Ashland" to refer to both Ashland and Rocket Products. However, as noted above, it is undisputed that Rocket Products used a bulk tank containing styrene. See Paragraph 8, *infra*. There is no evidence suggesting that Ashland placed or stored styrene in any bulk tanks, or that Ashland ever stored or sold any significant amounts of styrene during its operations. Thus, the statements in the above report about the "large source" and "concentrated source material" pertain to Rocket Products' activities and releases.

74. Shortly afterwards, on or about September 5, 2001, Soo Line initiated this lawsuit. The complaint described the "Site" in a manner that is not reflected in any of its investigation documents prepared for the investigation. The complaint states:

> ¶ 1. The Site is made up of the easternmost portion of the Shoreham Facility along Central Avenue Northeast, between 29th Avenue and 30th Avenue, in Minneapolis, Minnesota.
>
> ¶ 12. The Site is located in Northeast Minneapolis, Minnesota. It is a narrow strip of property extended along the west side of Central Avenue, Northeast, between 29th Avenue and 30th Avenue, approximately one and one half to two miles east of the Mississippi River. The Site is approximately 1.4 acres in size.

Notwithstanding the narrow definition of the "Site" employed in the complaint, Soo Line's complaint confirms, at paragraphs 17 and 18, that "Soo Line implemented a number of remedial

investigations to characterize the soil and groundwater at the Site" and foreshadows the need for contaminants "to be remediated." The complaint also noted that Soo Line had placed "the Site" in the MPCA's VIC and VPIC programs.

75. Soo Line informed the City of Minneapolis sometime in the late summer of 2001 that it was not ready to sell its property after all. Attached as Exhibit 71 to this Affidavit is a copy of minutes from an August 13, 2001 citizens group meeting in which Soo Line's decision was reported and discussed. These minutes were obtained from MPCA files and are Bates labeled MPCA016423 – 24. Excerpts from these minutes follow:

> Redevelopment meetings were not held. CP will not divide the 18 acre parcel. Property is not for sale. No future speculation to be made at this time regarding a sale. CP requires time to assess it's [sic] position; nothing will be known until spring 2002; perhaps we are looking at afive [sic] year long term plan. CP is committed to using the site for railroad purposes,
>
> Shoreham trackbuilding underway; new rail spur was built along Central Ave. side of Roundhouse for rail car storage and switching intermodal units. Spur is first of several new ones; plans call for a spur to reconnect with two bays of the Roundhouse for new use as a bonded warehouse facility -- all part of ongoing plan to return land to rail purposes. Track construction does not disturb polluted land.

76. In a letter dated November 5, 2001, the MPCA accepted the Phase II Supplemental Remedial Investigation Report and suggested additional work to be done by Soo Line. Attached as Exhibit 72 to this Affidavit is a copy of the MPCA's letter, obtained from the MPCA and Bates labeled MPCA007716 - 22

77. During 2002, Soo Line proposed various elements of additional investigation, some of which had been requested by the MPCA.

- For example, on April 19, 2002, Soo Line's consultant, AMEC, submitted its "Letter Work Plan for Characterization of Groundwater and Vapor Impacts (VIC Site No. 5080), Canadian Pacific Railway

Shoreham Facility, Minneapolis, MN." Attached as Exhibit 73 to this Affidavit is a copy of the letter work plan, obtained from the MPCA and Bates labeled MPCA007724 - 26.

- On April 23, 2002, AMEC submitted its "Letter Work Plan for Detailed Investigation of Soils in the VIC Site, VP 5080, Former Ashland Lease Area," Attached as Exhibit 74 to this Affidavit is a copy of the letter work plan obtained from the MPCA and Bates labeled MPCA009856 – 60.
- On or about August 16, 2002, AMEC submitted its letter work plans for "Detailed Characterization of the Onsite Contaminant Plume and Associated Hydrogeology" and a "Groundwater Receptor Survey at the VIC Site, VP 5080, Former Ashland Lease Area." Attached as Exhibit 75 to this Affidavit are copies of these letter work plans, obtained from the MPCA and Bates labeled MPCA009374 – 9384 and MPCA009386 – 9391.
- On October 8, 2002, AMEC provided a "Letter Supplementing the Letter Work Plan for a Groundwater Receptor Survey at the VIC Site, VP 5080, Former Ashland Lease Area, and the Work Plan for Detailed Characterization of the Onsite Contaminant Plume and Associated Hydrogeology." Attached as Exhibit 76 to this Affidavit is a copy of this supplemental letter, obtained from the MPCA and Bates labeled MPCA009462 - 65 (This letter responded to comments and questions received from and discussed with the MPCA on the above referenced work plans which were provided on September 13, 2002 in an MPCA e-mail to AMEC.)
- Finally, on October 28, 2002, AMEC submitted its "Letter Work Plan for Investigation of Hydrology and Extent of Contamination in the Prairie du Chien Aquifer (VIC Site No. 5080)." Attached as Exhibit 77 to this Affidavit is a copy of this letter work plan, obtained from the MPCA and Bates labeled MPCA009473 - 76.

78. During 2003, Soo Line proposed additional investigations and work. For example, on April 4, 2003, AMEC submitted the following letter work plans:

- Third Supplemental Letter Work Plan, Detailed Characterization of the Onsite Contaminant Plume and Associated Hydrogeology (VIC Site No. 5080), Canadian Pacific Railway Shoreham Facility, Minneapolis, MN
- Supplemental Letter Work Plan for Investigation of Flow Directions and Contamination in Groundwater in the Shallow Prairie du Chien Aquifer (VIC Site No. 5080), Canadian Pacific Railway Shoreham Facility, Minneapolis, MN

- Second Supplemental Letter Work Plan for Investigation of the Off-Site Extent of Groundwater Contamination in the Unconfined Aquifer (VIC Site No. 5080), Canadian Pacific Railway Shoreham Facility, Minneapolis, MN.

Attached as Exhibit 78 to this Affidavit is a copy of the April 4, 2003 cover letter that accompanied the above work plans, obtained from the MPCA and Bates labeled MPCA010710 – 11.

79. In mid-December, 2003, the MPCA conveyed a request that Soo Line commit to a specific schedule for response actions relating to lease area soils and site-wide free product. Attached as Exhibit 79 to this Affidavit is a copy of the MPCA request to Soo Line, which was obtained from the MPCA and is Bates labeled MPCA012660 – 71. The document was entitled: "Request To Canadian Pacific Railway To Conduct Interim Response Actions," and was dated December 15, 2003. The MPCA identified the areas of interest as follows:

> The Soo Line Shoreham Yard VIC site (the Site, MPCA Project Number VP5080) includes approximately 24 acres of the 230 acres Shoreham Yard Railroad Facility (the Facility) located in northeast Minneapolis at 2800 Central Avenue NE. The Facility is bounded by Central Avenue on the east, University Avenue on the west, lies north of 27th Avenue NE, and south of St. Anthony Blvd. The Facility has served as a railroad yard since the late 1800's and has historically housed a variety of railroad operations including an office, a rail switching facility, storage buildings, a car repair shop, a machine shop, refueling areas, and a waste reclamation building. The Facility is owned by the Canadian Pacific Railway (CPR), the voluntary party for the VIC Site.
>
> Historical activities by tenants at the Facility has included wood treating and barrel conditioning (Dworsky Barrel VIC site), a bulk oil facility and gas stations (Murphy Oil at northern part of Area A), and a chemical blending facility (Ashland Chemical at the southern half of Area A). A detailed history of the Site is provided in the 1999 Braun Intertec Phase I ESA. The Site has been divided into 6 main areas listed below and illustrated on the attached figure (Figure 1):
>
> Area A: Lease Area
> Area B: Collector Pan Area
> Area C: Round House Area

Area D: Ice House Area
Area E: Waste Reclamation Area
Area F: Pumphouse Area

Exhibit 79, p. 1. The MPCA acknowledged work that had been done over the last two years:

> Site investigations conducted by CPR over the past two years has included a) a vapor risk survey; b) a passive soil gas survey; c) a detailed onsite plume investigation; d) an offsite unconsolidated aquifer investigation; e) an offsite bedrock aquifer investigation; f) geophysical investigations; g) a ground water receptor survey; h) and a detailed unsaturated and saturated soils investigation in the former Lease Area and vicinity.

*Id.*, p. 2. The MPCA requested Soo Line "to commit to an aggressive compliance schedule to begin to remediate [Lease Area Soil Contamination and Site Wide Free Product]." *Id.*, p. 5. The MPCA called for soil vapor extraction at the former lease area. *Id.*, p. 6 (Table 4). The MPCA also requested the Soo Line investigate additional areas, including but not limited to "parts of the facility north and west of the Round House, including the Machine Shop, the former Diesel Shop; and the former Car Repair Shop areas." *Id.,* p. 5. The MPCA explained the significance of its request:

> Failure to follow a mutually agreed upon compliance schedule (draft schedule in Table 4) will result in CPR losing their opportunity to continue to work within the MPCA VIC Program and subsequent referral of the Site to the Superfund Program for possible placement on the state's Permanent List of Priorities (PLP). The Superfund Program initial steps would be to 1) Issue a Commissioner's Notice Letter (CNL) identifying CPR as a responsible party under MERLA; 2) Issuance of a Request For Response Action (RFRA) identifying necessary investigative and response actions which would form the basis for developing a compliance schedule and agreement for conducting response actions under the Superfund Program, and 3) If CPR chooses not to commit to a Superfund compliance schedule, the MPCA would issue a Determination of Inadequate Response (DIR) that would allow the MPCA to spend state Superfund dollars to conduct response actions at the Site and seek reimbursement from CPR.

*Id.*, pp. 5 – 6.

80. On March 5, 2004, Soo Line submitted a number of documents to the MPCA, including:

- Letter Work Plan for Investigation of Unsaturated Soil (VIC Site No. 5080), East Side Shoreham Facility, Canadian Pacific Railway, Minneapolis, MN (proposing 20 soil borings in Lease Area, Shops Area, Round House Area, Waste Reclaim Area.). Attached as Exhibit 80 to this Affidavit is a copy of this letter work plan, which was obtained from the MPCA and is Bates labeled MPCA014180 – 83;
- Third Supplemental Letter Work Plan for Investigation of the Extent of Groundwater Contamination in the Unconfined Aquifer (VIC Site No. 5080), East Side Shoreham Facility, Canadian Pacific Railway, Minneapolis, MN. Attached as Exhibit 81 to this Affidavit is a copy of this letter work, which was obtained from the MPCA and is Bates labeled MPCA014191 – 95; and
- Second Supplemental Letter Work Plan for Investigation of Flow Directions and Contamination in Groundwater in the Shallow Prairie Du Chien Aquifer (VIC Site No. 5080), Canadian Pacific Railway Shoreham Facility, Minneapolis, MN. Attached as Exhibit 82 to this Affidavit is a copy of this letter work plan, which was obtained from the MPCA and is Bates labeled MPCA014202 – 05.

81. Also on March 5, 2004, Soo Line sent a letter to the MPCA enclosing "Soo Line Railroad Company's concept plan for the development of a pilot test for the recovery of LNAPL located beneath and in the vicinity of the Ashland Lease Area." Soo Line's letter also acknowledged Ashland's offer to cooperate in that work and expressed a willingness to accept that offer. Attached as Exhibit 83 to this Affidavit is a copy of this letter and the attached plan, which were obtained from the MPCA and are Bates labeled MPCA014412 – 15. The enclosed work plan concluded with the statement that, "*Results of the Pilot Testing will be incorporated into Soo Line's Remedial Action Plan (RAP) and utilized to design an appropriate long-term remedial strategy for LNAPL in the vicinity of the former Ashland Lease Area*." (emphasis added)

82. On March 10, 2004, Soo Line sent a letter to the MPCA. Attached as Exhibit 84 to this Affidavit is a copy of this letter, which was obtained from the MPCA and is Bates labeled MPCA014453 – 54. This letter stated, in part:

> This is in response to your e-mail of March 8, 2004 requesting confirmation of Soo Line's intent to follow the schedule of the revised VIC/VPIC RAP/CAD Development & Implementation Schedule submitted by the MPCA staff via your e-mail dated February 19, 2004.
>
> Soo Line intends to follow the proposed schedule subject to the following comments and assumptions:
>
> 1. Soo Line is currently in compliance with the schedule. The Concept Plan for the development of a pilot test for recovery of LNAPL in the Ashland Lease Area was submitted on March 5, 2004. Soo Line awaits the MPCA's concept proposal for development of the SVE pilot test.
>
> 2. Soo Line anticipates no difficulty in completing the activities called for in April, 2004 regarding the REC and PSG Reports and related supplemental work plans. Some of these reports and work plans were submitted on March 5, 2004.
>
> 3. Assuming no unusual delay in MPCA review of its concept plan for recovery of LNAPL in the Ashland lease area and prompt resolution of any technical issues raised by the MPCA's review of the concept plan, Soo Line will submit its Work Plan for the LNAPL Recovery Pilot Test in or before May, 2004.
>
> 4. Soo Line will commence implementation of the LNAPL Recovery Pilot Test Work Plan within two months of receipt of all necessary regulatory permits and MPCA's review of public comments, including those of Ashland, and final written approval of the Work Plan.
>
> 5. Soo Line will submit the Work Plan for the SVE Pilot Test for the Ashland Lease Area at the earliest date possible during the period June to October, 2004. Soo Line's ability to deliver a technically competent and environmentally sound work plan for the SVE Pilot Test will be a function of the following factors: 1) evaluation of, and technical comment resolution regarding, the MPCA's concept proposal for the SVE Pilot Test; 2) what is learned from the pilot test for recovery of LNAPL; and 3) mutual agreement between MPCA and Soo Line regarding appropriate sequencing of SVE and LNAPL removal.

> 6. Soo Line intends to submit the VIC draft RAP and VPIC CADs by February 2005.
>
> 7. Soo Line intends to complete the Final RAP and CADs by May, 2005.
>
> 8. By Fall 2005, Soo Line intends to implement the final, approved RAP. The initial focus of implementation will be the LNAPL and SVE operable units.
>
> 9. Soo Line notes that the review and public comment process for any of the above mentioned submittals may affect Soo Line's ability to meet the schedule.

83. On March 11, 2004, the MPCA responded to Soo Line's letter. Attached as Exhibit 85 to this Affidavit is a copy of this letter, which was obtained from the MPCA and is Bates labeled MPCA014455 – 58. MPCA's response expressed the MPCA's desire that Soo Line take "a more aggressive approach to initiating response actions" and the MPCA's proposed "Soo Line VIC RAP Development & Implementation Schedule" for VIC Site # VP5080, included as "Attachment A" to the letter. The letter stated, in part:

> MPCA staff acknowledge that CPR has chosen to conduct Site investigations and prepare response action plans in accordance with the National Contingency Plan as a result of the ongoing litigation with Ashland Chemical and Murphy Oil, and that CPR has taken its budget constraints into account in setting its timetable for actions at the Site. However, MPCA staff believes that the circumstances of the Site require a more aggressive approach to initiating response actions, and that the actions set forth in the VIC RAP Development and Implementation Schedule are both reasonable and appropriate.

Exhibit 85, p. 2. The enclosed RAP Development and Implementation Schedule included a number of tasks and the deadlines by which the MPCA wished to see them completed. Among the tasks and attendant deadlines included in the MPCA's proposed Schedule were the following:

| **Task** | **Schedule** |
|---|---|
| Soo Line submits Work Plan for Area A Free Product Recovery Pilot Test to MPCA. | By May 2004 |
| Soo Line commences implementation of Area A Free Product Recovery Pilot Test Work Plan. | Within two (2) months from Soo Line's receipt of all necessary regulatory (e.g., MPCA and City of Minneapolis) permits and MPCA's final written approval of the Work Plan. |
| Subject to mutual agreement between MPCA and Soo Line in connection with the appropriate sequencing of SVE and Free Product pilot tests, Soo Line submits Work Plan for Area A SVE Pilot Test to MPCA. | By June 2004 |
| Submit VIC draft RAP to MPCA addressing, as necessary, Areas A, B, C, D, E, F and G and related off-Site areas. | By February 2005 |
| Final RAP (including NCP public comment period, revisions to RAP based upon public comment, and final MPCA approval). | By May 2005 |
| Soo Lines implements the Final RAP. Given the relative degree of contamination, MPCA and Soo Line agree that early partial RAP implementation will focus on Area A; specifically, the Free Product Removal Response Action and the SVE Implementation. | By Fall 2005 |

84. On March 25, 2004, the MPCA wrote another letter to Soo Line. Attached as Exhibit 86 to this Affidavit is a copy of this letter obtained from the MPCA and is Bates labeled MPCA014513 – 16. This letter stated, in part:

> The VIC staff has prepared this letter to provide further details regarding the Soil Vapor Extraction (SVE) pilot test that was requested as part of the remediation schedule that CPR agreed to follow in the March 22, 2004, letter to the MPCA. The MPCA has requested that CPR conduct both free product recovery pilot test and an SVE Pilot Test in the vicinity of the former Ashland Lease Area (FALA). This letter provides a brief

> conceptual description of the SVE Pilot Test that the MPCA has requested CPR to conduct.
>
> ***
>
> The MPCA considers that the SVE pilot test should be conducted during the late summer or fall of 2004 in order to be able to integrate the results into the draft RAP.

Exhibit 86, pp. 1, 4.

85. On or about February 17, 2005, Soo Line submitted to the MPCA its "Remedial Investigation Report" ("RI Report") for the East Side Shoreham Facility (VIC Site ID VP5080), Minneapolis, Minnesota. Attached as Exhibit 87 to this Affidavit is the body of the RI Report, which Soo Line provided to Ashland on February 17, 2005. Specifically, Exhibit 87 includes the cover page to the Report, the Table of Contents, pages ES-1— ES-9 and, 1-46 and Fig. 2-1. The purpose of an RI Report, according to Soo Line's Executive Summary, is "to provide an updated summary of the nature and extent of environmental contamination associated with the [Shoreham Yard] Site." Exhibit 87, p. ES-1.

86. Soo Line's RI Report included a brief history of the various areas under investigation at the Shoreham Yard facility. For instance, Soo Line summarized the historical use and contamination sources in and around the "Round House Area" as follows:

> The Round House Area is comprised of about 8 acres in the central part of the Site. It houses the round house, the ramp or run-through area (formerly referred to as the diesel house which was added to the Round House structure in approximately 1950), and a nearby building formerly used for paint storage. The round house was used for locomotive maintenance, light repair, and storage from the late 1880s until 1996. The southeastern portion of the round house was destroyed by fire in the early 1970s. Environmental investigations in the area have shown the presence of petroleum compounds and solvent related VOCs in soil and groundwater. Potential contaminant sources investigated in this area are associated with operations related to cleaning and maintenance of locomotives, a wrecking apparatus, machine shop and oil laboratories. Locations associated with passive activities, such as empty drum storage areas, underground drain lines/sewer lines, dumpster locations, ash pits, material storage, and former ASTs

> used to store waste oil and lube oil, have also been investigated. Of these potential sources, the principal contributors to this area's contamination appear to be locations where locomotives were cleaned and maintained, drum storage areas, and a dumpster location.

*Id.*, p. 7.

87. Soo Line described the history of the Waste Reclamation Area, another area under sole historical control of Soo Line, as follows:

> The Former Waste Reclamation Area is a north-south trending rectangular parcel situated along the western curb of Central Avenue from approximately 29th Avenue NE to 28th Avenue NE. The area is approximately 4 acres in size. The area was historically used to store material for railroad use. The waste reclamation building was constructed in 1941 and demolished in 1993. During the 1970s and 1980s, the waste reclamation building was used for storing batteries and journal-box (a train axle lubricating device) parts; journal oil and valve oil (in ASTs); and various chemicals including drums of solvents, kerosene, isopropyl alcohol, paint thinner, grease, undercoating chemicals, and hydraulic oil. Historic aerial photographs show that four ASTs were formerly located at the northern end of the former waste reclamation building. They were reported to have stored PCP, kerosene, diesel fuel and mineral spirits. Chlorinated VOCs have been reported above risk based criteria in locations where drums were stored directly on surface soils. In these areas, contaminant concentrations in soil appear to decrease rapidly with depth. Contamination in groundwater is reported to exceed Health Risk Levels (HRLs) for several compounds associated with chlorinated and non-chlorinated commercial solvents.

*Id.*, p. 8.

88. In addition to summarizing the historic uses and likely contaminant sources for areas such as these, Soo Line's RI Report included a summary of the current state of the contamination across the Site, based on Soo Line's interpretation of the data collected over the last several years. Contamination related to chlorinated solvents is not, according to this report, present just in the Former Lease Areas. Rather, it exists in areas, such as the Round House area, that have historically been under Soo Line's exclusive control, as indicated by the following excerpts:

The chlorinated solvent family of compounds (e.g., PCE, TCE, and 1,1,1 TCA) are . . . manufactured through a complex process that adds chlorine to petroleum components that have been ethylated. . . . The PCE, TCE, 1,1,1-TCA, and sum of chlorinated VOCs data indicate . . . contamination in the southeastern portion of the Round House Area (Figure 5-6). . . . In the Round House Area, highly elevated concentrations are generally restricted to shallow depths. [*Id.*, p. ES-7]

The data indicate that for the sum of chlorinated VOCs, groundwater impacts are greatest beneath the Former Ashland Lease Area and beneath the Round House Area. The impacted area beneath the Former Ashland Lease Area extends vertically into the Outwash Deposits and into the OPD. In shallow groundwater, there also appears to be a horizontal path from the Former Ashland Lease Area to the south that merges with shallow impacts present in the Waste Reclamation Area. The commingled plume migrates eastward and then descends in the Outwash Deposits. Impacts also occur in the shallow groundwater beneath the Round House Area and initially decrease with depth. At an elevation of approximately 750 feet above mean sea level (ft. amsl), concentrations increase substantially within the Outwash Deposits. This impacted area also extends through the Outwash Deposits and into the OPD. [*Id.*, p. ES-7-8]

The family of chlorinated solvent compounds degrades through hydrolysis and microbial processes. The result is a progressive dechlorination of the original contaminant, ultimately culminating in vinyl chloride or ethane/ethene. For the PCE to vinyl chloride (chlorinated ethane) group of compounds, groundwater impacts are present beneath both the Former Ashland Lease Area and beneath the Round House Area. The PCE impacts beneath the Former Ashland Lease Area decrease with depth through the Outwash Deposits, while cis-1,2-DCE and vinyl chloride increase in the Outwash Deposits. This indicates that PCE and TCE are degrading to cis-1,2-DCE and vinyl chloride. PCE impacts occur in the shallow groundwater beneath the Round House Area, and decrease with depth. The degradation product cis-1,2-DCE is present within the plume beneath the Round House Area, but vinyl chloride is not detectable. The Roundhouse Area plume continues to descend into the OPD and merges with the plume from the Former Ashland Lease Area at a geographic location below Central Avenue. [*Id.*, p. ES-8]

For the chlorinated ethane group of compounds, 1,1,1-TCA impacts are present beneath both the Former Ashland Lease Area and the Round House Area. Based on the current data, the impacts below the Former Ashland Lease Area appear to decline with depth, while the impacts below the Round House Area appear to be more persistent. The biodegradation product 1,1-DCA is produced below both area and descends through the Outwash Deposits into the OPD, whereupon the two impacted areas merge and flow to the south, again at a geographic location below Central Avenue. The abiotic degradation product 1,1-DCE is present associated with both the Former Ashland Lease Area and the Round House Area. [*Id.*, p. ES-8]

89. Furthermore, according to the RI Report, compounds related to chlorinated solvents are not the only contaminants present in areas other than the Former Lease Areas of the Site, as indicated by the following excerpts from the Report:

> Naphthalene and phenanthrene are compounds found in materials distilled from crude oil. They are much less volatile than toluene and xylene; therefore, higher concentrations tend to be found in heavier fuels, and fuel and non-fuel low- to mid-range petroleum distillates. The naphthalene data indicate substantial areas of high concentrations within the Former Ashland and Murphy Lease Areas and in the Pump House and Collector Pan Areas (Figure 5-4). The phenanthrene data indicate broad areas of high concentrations in the Former Murphy Lease Area, the Pump House Area, and the Collector Pan Area, and more limited areas of elevated concentrations in the Round House Area and Waste Reclamation Area. (Figure 5-5). [*Id.*, p. ES-7]

> Non-Aqueous Phase Liquid (NAPL) is the term applied to accumulations of free product in groundwater. Light Non-Aqueous Phase Liquid (LNAPL) is the term applied to NAPLs that are less dense than water, i.e., they tend to float on the water surface. NAPL accumulations are significant because they possess very high concentrations of contaminants and because they do not necessarily migrate in the direction of groundwater flow. LNAPL has currently or historically existed within the following Site areas: the Former Ashland Lease Area; Collector Pan Area; and the Pump House Area. (Figure 5-1). [*Id.*, p. ES-5]

The RI Report made the point that "[t]he composition of the free product in the Collector Pan area is markedly different from the Former Lease Area," Exhibit 87 p. 34, § 5.2.1. In the same sentence, however, the RI Report cited and relied upon a section from the 2001 IT report that had referred to the free product in "this area," meaning both the collector pan area and the former lease area. *Id.* *See* Exhibit 70 and paragraph 72, *infra.* The RI Report stated that both solvents and diesel fuel-type constituents appear in both ends of the area. In one end of the ground water free product "area," the chemistry is dominated by solvents. In the other end of the ground water free product "area," the chemistry is dominated by diesel fuel-type constituents.

90. Also on February 17, 2005, Soo Line held a public meeting for the ostensible purpose of providing the public with a summary of Soo Line's investigative findings at

Shoreham Yard to date. At the conclusion of the meeting, which I attended, Soo Line provided attendees with hard copies of its PowerPoint presentation. Attached as Exhibit 88 to this Affidavit are excerpts from that presentation. As shown in Exhibit 88, Soo Line made frequent reference to its actions at Shoreham Yard as being remedial in nature. For instance, in its slide entitled "National Contingency Plan (NCP)," Soo Line explained that the process it is following under federal law includes a "*Remedial* Investigation," the "*Remedial* Action selection," and a "*Remedial* Design/*Remedial* Action" phase (emphases added). *Id.*, p. 13. Another example of this emphasis was the slide entitled, "*Remedial* Action (Remedy) Selection," which outlined the process by which, as the title suggests, Soo Line will select the remedial action(s) it will implement under the process mandated by the National Contingency Plan (emphasis added). *Id.*, p.15.

91. Soo Line has received an extension for its RAP, and is slated to submit that document to the MPCA by the end of March 2005.

FURTHER YOUR AFFIANT SAITH NOT.

s/Laura M. O'Donnell________________
LAURA M. O'DONNELL

Subscribed and sworn to before me
this 25th day of March, 2005

s/ Leslie R. Bulson_____________
Notary Public